Elias Gonzales **GUERRA**

v.

**MANCHESTER TERMINAL CORPORATION et al.**

**Civ. A. No. 71–H–8.**

United States District Court, S. D. Texas, Houston Division.

Nov. 6, 1972.

Stuart M. Nelkin, Houston, Tex., for plaintiff.

Samuel Hooper, Baker & Botts, Houston, Tex., for Manchester Terminal.

Warner F. Brock, Brock & Williams, Houston, Tex., for Local 1581, International Longshoremen's Ass'n.

## FINAL ORDER

SINGLETON, District Judge.

The parties have submitted a stipulation as to the facts of this case on cross motions for summary judgment in this suit brought under 28 U.S.C. § 1345; 42 U.S.C. § 2000e–5, § 1981; 28 U.S.C. §§ 2201, 2202, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff Guerra is a Mexican National and registered resident alien in the United States who was employed by Manchester Terminal Corporation in its Dock and Commodity Department. Plaintiff's family resides in Mexico. In the late summer of 1965, the membership of Local 1581 voted that Mexican Nationals maintaining their families in Mexico would be given last preference for jobs in the Dock and Commodity area. Jobs in the Dock area included as a fringe benefit insurance coverage for the employee's family. Jobs in the Cotton Compress and Warehouse Department did not include this insurance with the family benefit. Since employees who did not have families in the United States could not qualify for the insurance, plaintiff Guerra was transferred to the Cotton Compress and Warehouse Department on September 7, 1965, and began work there on September 8, 1965. On October 21, 1965, Guerra filed a charge with the National Labor Relations Board. On March 5, 1966, Guerra sent a letter to the EEOC and on August 8, 1966, filed a charge with the EEOC. On January 10, 1967, Guerra voluntarily quit his employment with Manchester. On January 6, 1971, Guerra filed this civil action in district court.

█ In regard to the first question presented, i. e., was the transfer of Mr. Guerra a continuing act, this court agrees with the conclusion reached in Hutchins v. U. S. Industries, Inc., 309 F.Supp. 691 (E.D.Tex.1969). There Judge Fisher held that the discontinuation of a job classification was not a "continuing violation" but was a completed act when effected. And so it is here, when Guerra was transferred, the alleged violation was effected, and the act in question completed.

█ The second question presented by the instant case is procedural in nature, namely, does filing a complaint within 90 days of the alleged violation with the National Labor Relations Board toll the running of time under the Civil Rights Act Title VII. The Hutchins court held that where an employee prosecuted his grievance under the National Labor Relations Act obtaining an abitrator's decision adverse to him, he was barred from thereafter seeking relief under the Civil Rights Act of 1964. However, in the instant case, the employee Guerra

had not received a determination from the NLRB on his grievance before he filed this district court case. It is clear that an employee may simultaneously pursue his grievance with both the NLRB and under Title VII:

> "Our conclusion is supported by related decisions of this and other circuits which establish that Title VII is by no means the sole remedy available to prospective grievants. It is clear, for example, that certain unlawful employment practices of a labor union may be prosecuted before the NLRB under the National Labor Relations Act as well as before the EEOC under Title VII. E. g., Local Union No. 12, United Rubber, etc., Workers v. NLRB, 368 F.2d 12 (5th Cir. 1966)." Beverly v. Lone Star Constr. Corp., 437 F.2d 1136 footonote 22 (5th Cir. 1971).

■ From these decisions and from the clear import of Culpepper v. Reynolds Metal Co., 421 F.2d 888 (5th Cir. 1970) which held that it would be an improper reading of the purpose of Title VII if the Act's statute of limitations was strictly construed to penalize a common employee who had brought his grievance to his union before he filed with the EEOC, it must be concluded that filing with the NLRB tolled the running of the statute of limitations. This is the only just result even though the National Labor Relations Act and the Civil Rights Act are two different statutes with varied procedures and administrative channels.

■ With regard to the portion of the complaint based on 42 U.S.C. § 1981, this court holds that the statute of limitations has not run. Since the Civil Rights Act of 1866 does not provide for a statute of limitation, the applicable statute of limitations is the state statute for general civil actions not otherwise provided for, see Beard v. Stephens, 372 F.2d 685 (5th Cir. 1967); or the statute governing contract claims. Boudreaux v. Baton Rouge Marine Co., 437 F.2d 1011 (5th Cir. 1971).

■ Irrespective of which theory is used, the action would have been barred on September 7, 1969, because as noted earlier in regard to the Title VII claim, the § 1981 action is based on the act completed on September 7, 1965. The Texas statute of limitations for civil claims not otherwise provided for is four years. Tex.Rev.Civ.Stat.Ann art. 5529. The Texas statute applicable to contract claims is four years. Tex.Rev.Civ.Stat. Ann. art. 5527. Therefore, the cause would have been barred on September 7, 1969, except for the fact that the § 1981 statute of limitation was tolled by Guerra filing with the EEOC on either March 5 or August 8, 1966. This result is apparently the one called for by the Fifth Circuit in a footnote in Boudreaux, supra at p. 1017 footnote 16:

> "Nevertheless, in the instant case, to the extent that either one-year statute (art. 3536 or art. 3534) is applicable, they were clearly tolled by Boudreaux's attempt to seek relief with the EEOC, which occurred some nine months after the accident which marked the last date at which he reported to a shape-up. See Culpepper v. Reynolds Metals Co., 421 F.2d 888, 891–893 (5th Cir. 1970)."

■ There is no question that 42 U.S.C. § 1981 affords a remedy for employment discrimination apart from and concurrent with Title VII. Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970).

Having resolved the jurisdictional questions in favor of the employee, the merits of the complaint must be weighed.

The 1964 Civil Rights Act reads in part:

> "(a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, bcause of such individual's race, color, religion, sex, or national origin.

\* \* \* \* \* \*

"(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e—2(a)(1) and (2) and § 2000e—2(c)(1), (2) and (3).

The record does not reveal that the defendants have discriminated against the plaintiff on the basis of any of the prohibited classifications of Title VII, i. e., race, color, religion, sex, or national origin.

The stipulated facts establish that "all, or nearly all of the members of defendant Local Union are either Mexican by birth or of Mexican-American ancestry" (Stipulation p. 5).

■■ If there was any discrimination, it was based upon the foreign residency of the plaintiff's family and the plaintiff's status as an alien. This classification like that of citizenship is not a protected classification of Title VII.

Espinoza v. Farah Mfg. Co., 462 F.2d 1331 (5th Cir. 1972). Under the holding of *Espinoza* this court would have to reject plaintiff's request for relief under Title VII, 42 U.S.C. § 2000e—2.

However, plaintiff's suit is also based upon 42 U.S.C. § 1981. Said 1870 Civil Rights Act reads in part:

> "*All persons* within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. R.S. § 1977."

42 U.S.C. § 1981. [emphasis added] The historical note in 42 U.S.C.A. § 1981 gives the derivation of this section as Act May 31, 1870, c. 114, § 16, 16 Stat. 144.

Due to the importance of the issue and the novelty of the question presented, namely, is an alien covered under the protective language of § 1981, this court has researched the legislative history of § 1981 to better determine the intent of Congress.

In 1870 senate bill 365 was introduced by Senator Stewart of Nevada to extend the coverage of the 1866 Civil Rights Act. It read as follows:

> "*Be it enacted, &c.*, That all persons within the jurisdiction of the United States, Indians not taxed excepted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or

charge shall be imposed or enforced by any State upon any person emigrating thereto from a foreign country which is not equally imposed and enforced upon every person emigrating to such State from any other foreign country, and any law of any State in conflict with this provision is hereby declared null and void.

"Sec. 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person being an *alien,* or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

"Sec. 3. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted, and said act, except the first and second sections thereof, is hereby referred to and made a part of this act." 91 Cong.Globe 1536. (emphasis added)

Senator Stewart explained the purposes of the new bill:

"Mr. STEWART. The original civil right bill protected all persons born in the United States in equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have the equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States. That is all there is in the bill." 91 Cong.Globe 1536.

A few minutes later a brief colloquy between Senator Stewart and Senator Pomeroy further clarified the purposes of the bill:

"Mr. POMEROY. I have not examined this bill, and I desire to ask the Senator from Nevada a question. I understood him to say that this bill gave the same civil rights to all persons in the United States which are enjoyed by citizens of the United States. Is that it?

"Mr. STEWART. No; it gives all the protection of the laws. If the Senator will examine this bill in connection with the original civil rights bill, he will see that it has no reference to inheriting or holding real estate.

"Mr. POMEROY. That is what I was coming to.

"Mr. STEWART. The civil rights bill had several other things applying to citizens of the United States. This simply extends to foreigners, not citizens, the protection of our laws where the State laws deny them the equal civil rights enumerated in the first section.

"It has nothing to do with property or descent. We left that part of the law out; but it gives protection to life and property here. The civil rights bill, then, will give the United States courts jurisdiction to enforce it.

"Mr. POMEROY. I am undoubtedly in favor of the object of the bill. I wanted to see how far the Senator was willing to go. So far as the bill goes I think it is right; I only question the propriety of not going further myself." 91 Cong.Globe 1536.

S. 365 and Section 1 of the Civil Rights Act of 1866 thus differed only in that S. 365 was broader in its coverage of persons but narrower in subject matter.

The Senate deferred consideration of S. 365 on February 24. On May 16, 1870, however, when the Senate began debate of S. 810, a bill to enforce the Fifteenth Amendment, Senator Stewart moved to add S. 365 and S. 144.

Senator Stewart's amendment read (omitting portions not relevant here):

"*And be it further enacted*, That all persons within the jurisdiction of the United States, (Indians not taxed excepted,) shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating thereto.

"Sec. 2. *And be it further enacted*, That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties, on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and on conviction shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

"Sec. 3. *And be it further enacted*, That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted; and said act, except the first and second sections thereof, is hereby referred to and made a part of this act; and section fifteen and section sixteen thereof shall be enforced according to the provisions of said act." 91 Cong.Globe 3480.

The Senate voted on neither the amendment nor on S. 810. On May 18, 1870, however, the Senate began consideration of H.R. 1293, a House-passed bill to enforce the Fifteenth Amendment. Senator Stewart immediately moved to "offer as an amendment to the House bill the Senate [bill], together with the amendments which I offered to that bill." 91 Cong.Globe 3561. After explaining the provisions of the substitute, Senator Stewart stated:

"The rest of it is in the machinery of the civil rights bill modified to suit the emergencies of the case *whereby you have agents to enforce the law. . . . .*" 91 Cong.Globe 3561. (emphasis added)

The relevant portions of Senator Stewart's substitute read:

"Sec. 15. *And be it further enacted*, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating to such State from any other foreign country, and any law of any State in conflict with this provision is hereby declared null and void.

"Sec. 16. *And be it further enacted*, That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties, on account of such person being an *alien*, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be

deemed guilty of a misdemeanor, and on conviction shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

"Sec. 17. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted; and said act, except the first and second sections thereof, is hereby referred to and made a part of this act; and section fifteen and section sixteen hereof shall be enforced according to the provisions of said act." 91 Cong.Globe 3562.

The Senate substitute, with amendments, and with the paragraphs renumbered, became the Act of May 31, 1870, Ch. 114, 16 Stat. 144. See 91 Cong.Globe 3690; 92 Cong.Globe 3809; 92 Cong. Globe 3884; 93 Cong.Globe 4307 (all 1870).

The two-fold purpose of Sections 15 and 16 in the 1870 Act, then, was to broaden the coverage of the 1866 Act to include aliens and to add additional enforcement mechanisms.

In 1866 Congress authorized a codification of Federal statutes. 14 Stat. 74 (1866); 18 Stat. 113 (1874). It was not Congress but three appointed Commissioners, acting under the supervision of the Secretary of State, who compiled the Revised Statutes, and added the marginal notes. The Commissioners completed their codification in 1873.

Obviously aware that coverage of Section 16 of the Act of 1870 had been extended to aliens but that it excluded the property rights originally protected by Section 1 of the 1866 Act, the Commissioners split Section 1 between R.S. Section 1977 (later 42 U.S.C. Section 1981) and R.S. Section 1978 (later 42 U.S.C. Section 1982). The Commissioners' marginal note to R.S. Section 1978 referred to the 1866 Act and the rights of *citizens.* The marginal note to R.S. Section 1977 on the other hand, referred to the 1870

Act and equal protection under the law, for citizens and noncitizens alike.

■ In light of this history, this court is convinced, despite any deletion of the term alien in 42 U.S.C. § 1981, that the codifiers clearly intended for aliens to be protected under the broad aegis of "all persons". The case of Martinez v. Fox Valley Bus Lines, 17 F.Supp. 576 (N.D.Ill.1936) held that an alien did have a right to sue in tort for a negligent auto collision and in effect that no rule, law or court could prevent such filings by aliens. Roberto v. Hartford Fire Ins. Co., 177 F.2d 811 (7th Cir. 1949) held that even an alien who had been ordered deported could sue on an insurance contract. Clearly, aliens are protected by 42 U.S.C. § 1981.

The recent case of League of Academic Women v. Regents of the U. of Cal., 343 F.Supp. 636 (N.D.Cal.1972) unequivocally states that noncitizens are included in the ambit of § 1981:

"Section 1981 was enacted to protect the rights of two groups of people— non-whites and non-citizens who were not afforded equal treatment to white citizens. The standard against which the rights of these individuals must be measured is the rights *of white citizens.* The change in language to include 'all people' was designed to include non-citizens and persons not born in the United States within the coverage of the Act."

In commenting on Roberto v. Hartford Fire Ins. Co., *supra,* the court said:

"While 42 U.S.C. § 1981 may go somewhat beyond strictly racial discrimination to extend protection to aliens as was the case in Roberto, such a situation is not presented here [in *League of Academic Women*]."

The court continued in this vein to point out the valid and distinguishing factor of the *League of Academic Women's* case from the *Roberto* case and the instant case, namely, that the complaint was grounded in sex discrimination against women; *Roberto, supra,* was based on

the right to contract which is protected by § 1981. The history of the Civil Rights Acts of 1866 and 1870 shows that sex discrimination was not under consideration and no attention was devoted to such argument. Therefore, this California case along with Braden v. University of Pittsburgh, 15 EPD ¶ 7936 (January 31, 1972) which also involves women in the academic world filing complaints under § 1981 are factually and historically distinguishable.

But the analysis cannot abate here. Two other significant cases on aliens and their rights to work have unequivocally captured the spirit of the original bill. One of these cases is Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) where in striking a California fishing license statute the High Court said:

> " 'All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.' [May 31, 1870] 16 Stat. 140, 144 [c 114], 8 U.S.C. § 41, 8 U.S.C.A. § 41 [2 FCA title 8, § 41]. The protection of this section has been held to extend to aliens as well as to citizens.[7] Consequently the section

7. Yick Wo v. Hopkins, supra, 118 U.S. [356] at page 369, 6 S.Ct. [1064] at page 1070, 30 L.Ed. 220 [226]; United States v. Wong Kim Ark, 169 U.S. 649, 696, 18 S.Ct. 456, 475, 42 L.Ed. 890 [907]; In re Tiburcio Parrott, C.C., 1 F. 481, 508, 509 [6 Sawy. 349]; Fraser v. McConway & Torley Co., C.C., 82 F. 257.

and the Fourteenth Amendment on which it rests in part protect 'all persons' against state legislation bearing unequally upon them either because of alienage or color. See Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847 [92 L.Ed. 1187]. The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." 334 U.S. at 419–420, 68 S.Ct. at 1142.

Another case closely in point is Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1917) where the court struck an Arizona law requiring employers to hire 80% qualified electors or native-born citizens. The next prominent case dealing with the alienage question is Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). There the court struck two states' welfare statutes. One based benefits on citizenship, and the other on length of residency in the state.

The significance of these last three cases is that they all turned on state action and the equal protection of the law under the Fourteenth Amendment.

The necessity of such state action appears to have been in the mind of Senator Stewart when he introduced the bill on February 24, 1870, and made the response to Senator Pomeroy's question set out in detail above: "This simply extends to foreigners, not citizens, the protection of our laws where the *State laws* deny them the equal civil rights enumerated in the first section." 91 Cong. Globe 1536 (emphasis supplied). Again, in the engrossing of the Bill: "Sec. 16: That any person who, under color of any law, statute, ordinance, regulation or custom . . . being an alien . . . ." 91 Cong.Globe 3689.

The clause that gives pause to a conclusion requiring· state action is found below Section 16 where it is stated in Section 18:

> "And be it further enacted, that the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication,

passed April 9, 1866, is hereby re-enacted; and sections sixteen and seventeen *hereof* shall be enforced according to the provisions of *said* act." 91 Cong.Globe 3689.

Literally, this would mean that Section 16 with its provision about aliens would be enforced in accordance with the Thirteenth Amendment and thus, no state action is required and private discrimination would be cognizable under 42 U.S.C. § 1981. The reader cannot help but be struck by the language of clauses situated so closely together. Surely the legislators must be attributed with understanding the clear import of the clauses in question.

 Undeniably, some cases have held that color of law is necessary to hold a defendant in actions under § 1981. Waters v. Paschen Contractors, Inc., 227 F. Supp. 659 (D.C.Ill.1964). But this is not the only reading that can be given to the statute. Neither color of law nor state action is properly a limitation upon Congressional power posited upon the Thirteenth Amendment or the District and Territory power of the First Article. Courts have recognized that § 1981 is based upon these sources, as well as upon Fourteenth Amendment authorization. Accordingly, this court concludes that in circumstances such as this no color of law or state action requirement should be read into the statute.

The United States Court has indicated generally that the Act of 1866, which was the origin of § 1981, was intended to outlaw *all* discrimination, "whether or not under color of law" and as such was constitutional under the Thirteenth Amendment. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The Supreme Court there expressly overruled Hodges v. United States, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906), which had held in 1906 that § 1981 did not apply to conspiracies by private individuals to interfere with a contract of employment.

It is interesting to note the language of the *Jones* case which was a § 1982 action involving Negroes' rights to purchase houses.

"Indeed, if § 1 [of the 1866 Act] had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made so [sic] sense at all. For that section, which provided fines and prison terms for certain individuals who deprived others of rights 'secured or protected' by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed. These [sic] would, of course, have been no private violations to exempt if the only 'right' granted by § 1 had been a right to be free of discrimination by public officials. Hence the structure of the 1866 Act, as well as its language, points to the conclusion urged by the petitioners in this case—that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, although only those deprivations perpetrated 'under color of law' were to be criminally punishable under § 2." 392 U.S. 425–426, 88 S.Ct. 2195.

A number of federal courts have now held that § 1981 provides relief where there has been private discrimination in making and enforcing contracts. Dobbins v. International Brs. of Elec. Works, 292 F.Supp. 413 (D.C.Ohio 1968). One such court has stated:

"At least since Jones v. Mayer, a strictly private right, be it in the property field as such, or the contract field as such, is within the protection of the Civil Rights Act of 1866 against interference by a private citizen or a group of citizens. Governmental sanction or participation is no longer a necessary factor in the assertion of a § 1981 action." *Dobbins, supra* at p. 442.

 Therefore, this action may be maintained under 42 U.S.C. § 1981. Since both parties have stipulated the facts for the purposes of summary judgment, this court hereby finds that the defendants were engaged in a discriminatory prac-

tice. A hearing will be held on January 22, 1973, at 9:30, a. m., to hear evidence on damages. An injunction is hereby entered to enjoin the defendants from further practicing the policy complained of herein.