Oliver I. SABALA, Individually and on behalf of all others similarly situated

v.

WESTERN GILLETTE, INC., et al.

Leonard M. RAMIREZ, Individually and on behalf of all others similarly situated

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al.

Civ. A. Nos. 71-H-961, 71-H-1338.

United States District Court,
S. D. Texas,
Houston Division.

July 17, 1973.

Henry M. Rosenblum, Rosenthal, Didion & Rosenblum, Houston, Tex., for plaintiff Oliver I. Sabala.

Sidney Ravkind, Mandell & Wright, Houston, Tex., for plaintiff Leonard M. Ramirez.

L. G. Clinton, Jr., Fulbright, Crooker & Jaworski, Houston, Tex., for defendant Western Gillette, Inc.

L. N. D. Wells, Jr., G. William Baab, Mullinax, Wells, Mauzy & Baab, Dallas, Tex., for defendants International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Southern Conference of Teamsters.

James P. Wolfe, Houston, Tex., for Local Union 988, Teamster, Freight, Tank Line and Automobile Industry.

SINGLETON, District Judge.

*Memorandum and Order:*

These cases involve the question of facially neutral seniority systems and their effect on past discrimination in employment.

These two cases alleging racial discrimination in employment were consolidated and tried before the court. Plaintiff Sabala is a Mexican American who works in Houston, Texas, for defendant Western Gillette, Inc., a nationwide trucking firm, and brings his suit as a class action. Plaintiff Ramirez is also a Mexican American who currently works for Western Gillette, Inc., in Salt Lake City but who worked in Houston during the period in question. He brings his suit individually.

The defendants are Western Gillette, Inc., and three union organizations. These unions are International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Southern Conference of Teamsters, and Local 988, Teamster, Freight, Tank Line and Automobile Industry. Local 988 is the collective bargaining representative for the truck drivers at the Western Gillette terminal in Houston, Texas, and it is a member of both the Southern Conference of Teamsters and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Against all the defendants Sabala and Ramirez and the class plaintiffs have filed suit under 42 U.S.C. § 2000e et seq. (the Civil Rights Act of 1964) and 42 U.S.C. § 1981 (the Civil Rights Act of 1866). They allege basically two causes of action. In each cause plaintiff Sabala, both on his own behalf and as representative of a class pursuant to Fed.R. Civ.P. 23(b)(2), seeks a declaratory judgment, injunctive relief, damages, and attorneys' fees. By an order entered before trial, this court defined the class of persons plaintiff Sabala is entitled to represent as follows: "All Mexican Americans and Blacks currently employed by Western Gillette during the pendency of this action as city drivers in Houston, Texas." Plaintiff Sabala in the first cause of action has alleged that defendants Western Gillette, Inc. [hereinafter referred to as "Employer" or "Company"], International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America [hereinafter referred to as "International"] and Southern Conference of Teamsters [hereinafter referred to as "Southern Conference"], Local Union 988, Teamster Freight, Tank Line and Automobile Industry [hereinafter referred to as "Local"], have entered into collective bargaining agreements which provide for separate seniority for "city" and "road" employees at the Houston terminal, with

each class having its own seniority roster. "City" drivers are those who drive principally in Houston and make short runs inside the city · limits, whereas "road" drivers make long hauls between different cities. Plaintiffs allege that the conditions imposed on transferring between "city" and "road" are so onerous that the effect is that it is impossible to transfer. It is alleged that the agreements in effect require a city driver to forfeit all "job seniority rights" when he transfers to a road position. In addition, plaintiff alleges, upon transfer from city to line, the driver is placed upon a probationary period during which time he can be discharged. Although there is some dispute as to the truth of this allegation, the court feels that a letter, written to plaintiff Sabala on October 14, 1971, which waived the 30-day probationary period, conclusively establishes the existence of this further burden on transfer from city to line position. The effect, purpose, and intent of the policies and practices pursued by defendants have been and continue to be to limit, segregate, classify, and discriminate against Mexican Americans and Black employees in equal employment opportunities secured to them by the provisions of Title 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981. Plaintiffs argue that while nondiscriminatory on its face, the bargaining agreements creating separate seniority systems perpetuate and continue past discriminatory practices of the defendants and thus lock in past discrimination.

In the second cause of action, plaintiffs allege that the defendants International, Southern Conference, and the Local have violated their duties of fair representation imposed upon them by the National Labor Relations Act, 29 U.S.C.A. § 151, in that they have knowingly acquiesced, joined, or conspired in the allegedly unlawful discriminatory practices and policies complained of and have failed to protect Black and Mexican American employees of defendant Employer from said alleged discriminatory policies and practices.

Plaintiff Ramirez basically has the same cause of action as Sabala and the class. Therefore, his case was consolidated with that of the class, and this court's findings with respect to the class apply to plaintiff Ramirez also.

The trial was ordered bifurcated by this court and this opinion will deal basically with the questions of jurisdiction and liability with some discussion of remedy. Pursuant to the findings as to these two issues, there will be another hearing as to the question of specific remedy and damages, if any.

## THE CLASS MAINTAINABLE

■ As stated earlier, this court before trial had ruled that a class action was maintainable. Fed.R.Civ.P. 23 provides that an order authorizing a class action may be amended or redefined at any time before a decision on the merits. This court, however, declines to amend its order authorizing the class action previously stated. There is little question that the requirements of rule 23(b)(2) have been met. Rule 23(b)(2) is the normal vehicle for civil rights class actions and the allegations and evidence that the defendants have acted on grounds generally applicable to the class thereby making appropriate injunctive relief with respect to the class as a whole demonstrate this suit easily falls within the rule 23(b)(2) class structure. Defendants basically argue that three prerequisites of rule 23(a) are not met. First, they argue that the class is not so numerous as to make joinder of the individual plaintiffs impracticable. This is a requirement of a class action under rule 23(a)(1) but the court reaffirms its earlier rulings that joinder of all members is impractical. As earlier stated, the class plaintiff is allowed to represent is as follows: ·"All Mexican Americans and Blacks currently employed by Western Gillette during the pendency of this action as city drivers in Houston, Texas." The total number of potential class members under this court's definition was thirty-nine. Of that number, one has been eliminated by

termination of his employment, and approximately twelve have opted out of the class. Thus, there are twenty-six members of the class. This court holds that this number is great enough along with other factors such as the expediency of the joinder of all the potential plaintiffs, the inconvenience of trying individual suits, and the ability of the individual litigants to institute an action on their own behalf. See Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452 (D.C.Pa.1968).

■ Secondly, defendants argue that a class action is not appropriate in this case because each member of the class will need to show individual evidence of discrimination and injury therefrom and, therefore, in effect there are no common questions of law or of fact. This court rejects this contention. The suits to enjoin racial discrimination in employment are by their nature appropriate for class actions. Wright & Miller, Federal Practice and Procedure § 1776. Here, even though some relief might need to be fashioned individually, the common questions of law and fact as to whether there was discrimination as to the class of Mexican Americans and Blacks is enough to satisfy the requirements of rule 23. See Oatis v. Crown Zellarback Corp., 398 F.2d 496 (5th Cir. 1968); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Johnson v. Georgia Highway Express, Inc., 417 F. 2d 1122 (5th Cir. 1969).

■ Finally, the Local raises one other problem as to the maintenance of a class action. It argues that Mexican Americans cannot sue under § 1981 and plaintiff Sabala cannot adequately represent a class under § 1981. This court has already held that § 1981 protects aliens from discrimination. Guerra v. Manchester Terminal Corp., 350 F.Supp. 529 (S.D.Tex.1972). This same reasoning would apply to Mexican Americans who are discriminated against on the basis of their ethnic heritage. In any event, in this court's pretrial order the parties stipulated as to jurisdiction under § 1981. This court holds that plaintiff Sabala can adequately represent the class of both Mexican Americans and Blacks and declines to modify its original order.

■ At trial, plaintiffs suggested that the class should be broadened to include minority teamster employees employed by Western Gillette in the entire Southern Conference. This court declines to broaden the class from the class previously defined. Even though the evidence shows discrimination against defendant Company's Houston minority employees with respect to transfer to other southwest area terminals, the issue of whether there was discrimination against defendant's employees in other terminals is not before this court. This court without notice to unions and employees at other terminals will not expand the class beyond the limits all parties acted under in their trial preparation and presentation of evidence. Thus, the class and the relief are restricted to minority employees who are or were at the Houston terminal.

## JURISDICTION

Before reaching the questions of liability and remedy, this court must first discuss the question of jurisdiction. Plaintiffs have sued two sets of defendants: (1) the defendant Western Gillette Company, Inc., and (2) the defendant unions. Jurisdiction over the defendant Company is alleged under 42 U. S.C. § 2000e and 42 U.S.C. § 1981. 42 U.S.C. § 2000e–2(a)(1) reads as follows:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which

would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 1981 reads as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

42 U.S.C. § 1981 prohibits private racial discrimination in employment by both employers and labor unions. Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), Sanders v. Dobbs House, Inc., 431 F.2d 1097 (5th Cir. 1970). It is clear that jurisdiction over the defendant Company is validly alleged under both of these provisions. Jurisdiction over the defendant unions is alleged under these two provisions and, in addition, under 29 U.S.C. § 151 et seq. and the concept of unions duty of fair representation.

■ The unions agree that this court has jurisdiction under § 1981 and under the duty of fair representation but attacks this court's jurisdiction under 42 U.S.C. § 2000e et seq. on the grounds that plaintiff failed to file a charge against the defendant unions with the Equal Employment Opportunity Commission. This point is a valid one and this court holds that there is no jurisdiction against the unions under 42 U.S.C. § 2000e. The case of Miller v. International Paper Company, 408 F.2d 283 (5th Cir. 1969) is directly in point. That case held that an employee may not bring suit against a union under Title VII unless the union has first been charged in a complaint brought by the plaintiff before the EEOC.

## LIABILITY

Having disposed of the jurisdictional issues involved, this court may now reach the merits of plaintiffs' case. The evidence at trial basically is as follows. The drivers of Western Gillette, as is true of most drivers throughout the country, are divided into two main classifications. The first classification is for drivers who basically drive short hauls in the city [hereinafter referred to as "city drivers"]. The second classification is for drivers who make long hauls between cities [hereinafter called either "road" or "line drivers"]. At least in the southern United States, generally road drivers have been predominately white. It was testified to and this court finds as credible that one main reason for this was that minority drivers were not able to find accommodations along the road in many southern states. Historically, road drivers have earned more than city drivers and road driving has been considered a more lucrative position than city driving. This situation is changing because the road drivers' pay has not increased at as great a rate as the pay of city drivers. Other than that, the principal differences between road and city driving is that in city driving you are able to live at home but you must be able to maneuver a truck in city traffic and in tight situations. Road drivers, on the other hand, have more freedom and do not have to have the skills in maneuvering a truck intricately that city drivers have but must remain many hours away from home.

Plaintiffs are drivers of Western Gillette and allege that Western Gillette and the unions have discriminated against them. Plaintiffs use a two-pronged theory to show discrimination. First, plaintiffs' claim that minority drivers were overtly discriminated against in hiring and transferring to road driving positions. Secondly, they allege that the

seniority provisions applicable to transferring from one driving classification to another, although on their face applying equally to white and minority drivers, have the effect of "locking in" this past discrimination. These seniority provisions, agreed to between union and Company representatives as part of the collective bargaining agreement and the practices pursuant to this agreement, will be more fully explained later. Basically, however, they provide that if a driver transfers to a new classification he retains his seniority date with respect to when he hired on with the Company (e. g., for pension purposes) but must begin as a new man with respect to his seniority in competing with other men for driving assignments in his new classification.

This court finds that members of the class and plaintiff Ramirez have been discriminated against in transferring to road positions with Western Gillette. This conclusion is based upon direct evidence of overt discrimination by Western Gillette as well as by statistical evidence.

Plaintiff Ramirez began employment for Western Gillette in August of 1966 as a city driver. It was testified to that a short while thereafter, in approximately October 1966, he sought to transfer to line employment. He was discouraged from seeking to transfer and when he later persisted to seek to transfer was told that he would have to quit his job as a city driver and then submit an application for the line and that there was no line position open at that time.

Plaintiff George Williams, a city driver for Western Gillette since 1954 with 17 years previous experience as a road driver, testified he was told in 1958 by the Company's terminal manager that "there was no such thing as Negro road drivers for Western Gillette." In 1964, after hearing about the Civil Rights Act, this plaintiff again asked the Company's terminal manager about road jobs. The then terminal manager walked off. In 1965, he asked the terminal manager, who told him that he

would lose his seniority and nine times out of ten lose his job. As a result of this advice, plaintiff Williams, in his capacity as job steward, told other minority city drivers who asked him about the possibility of their obtaining road positions that they might lose their jobs. He further testified that he understood from the Company that upon transfer a new road employee would be subject to the 30-day probationary period in which he could lose his job.

Plaintiff Luther Thomas testified that he asked the terminal manager about the possibility of a road job but was advised that he would lose all of his seniority to which he replied that he would still like to try for the job but was not given an application.

Plaintiff Alfonso Adams testified that the Company's operations manager in Houston told him that he would have to resign his city job first and then go home, and the operations manager would consider giving him a road job. Adams testified that the operations manager told him, "You'll have to quit and start all over again like a new employee."

Plaintiff Oliver Sabala testified that he asked supervisory personnel at the Company in 1967 for road work but was told by the supervisory personnel that he might get them both run off from the Company if he pushed for it. Sabala further testified that this supervisory person said that the Company did not hire "his" people on the road. In November 1968, Sabala went on the board as a regular city employee. Thereafter he testified that he continually inquired about road jobs of the road dispatcher and was regularly turned down.

Evidence was submitted that the Company kept records of the race of its drivers at its headquarters at least as to plaintiff Alfonso Adams, on his 1963 employment application; as to plaintiff Leonard Ramirez, on his post-1965 employment application and on its seniority list of road drivers as of August 26, 1971, which was distributed to its terminal manager in Van Horn, Texas, which

**1150**

list was not used for EEOC reporting purposes.

In addition, and perhaps more importantly, the statistics of Western Gillette and its Houston terminal indicate that there has been discrimination. The Houston terminal of Western Gillette is in the Company's "southwest area" although it is in the "Southern Conference" of the Teamsters Union. The southwest area currently consists of terminals at Houston, Texas, Van Horn, Texas, Dallas, Texas, Oklahoma City, Oklahoma, and Memphis, Tennessee. The evidence in this case demonstrated that there were 127 line drivers working for Western Gillette in the Southern Conference in 1965. At the present time there are 125 line drivers employed in the Southern Conference; 77 have been hired as new employees since 1965, all White. Two Blacks work as line drivers in the Southern Conference, however, neither of them is a new hire. Dan Haggerty transferred from Miami, Oklahoma, to the road in Dallas, Texas, in December 1968, and George Williams transferred from city delivery work in Memphis to line work in Memphis in 1971. There is one Mexican American line driver, Ortis, who transferred into the Southern Conference in 1960 after being hired in Los Angeles in 1955. He continues to work as a line driver out of Houston although he is presently physically incapacitated. As far as the Houston terminal is concerned, Western Gillette has approximately 29 drivers. Of these currently only one is Mexican American and there are no Blacks. The composition of the city drivers in Houston, however, is radically different. The 11 drivers hired during or prior to 1956 are all Blacks. Of the 54 drivers hired during and since 1957, 23 are White, 25 are Black, and 6 are Mexican American.

These statistics demonstrate a pattern of discrimination against minority road drivers at Houston by Western Gillette. Of the 29 road drivers at Houston, only one is of a minority group. Of the 65 city drivers at Houston, 42, well over half, are either Black or Mexican American. "In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts." Jones v. Leeway Motor Freight, Inc., 431 F.2d 245 (5th Cir. 1970). Defendants argue that since some minority drivers have now or have in the past been road drivers at Houston or for other southwest area terminals, the statistics do not indicate discrimination. Defendants in effect contend that statistics cannot show discrimination unless there is one hundred percent discrimination. This court cannot accept this theory. Both under the Civil Rights Act of 1964 and under § 1981 tokenism cannot be countenanced. These statistics and evidence presented at trial indicate that there has been discrimination. The fact that this discrimination is somewhat subtle in that there is not one hundred percent discrimination does not make this fact any less invidious.

Plaintiffs allege this discrimination is a result of past discrimination on hiring and on transfers and that the statistics demonstrate this discrimination is locked in by the present seniority system in effect at Western Gillette's Houston terminal. As noted earlier, there are two classifications for drivers at Western Gillette at its Houston terminal—road and city. These two classifications each have their own seniority system. When a driver joins Western Gillette, he is accorded certain rights, such as date for his pension, on the basis of his seniority. This is called "company seniority." Although there is testimony to the contrary, this court finds that a driver keeps his company seniority when transferring from road to city or vice versa. But there is a second type of seniority called "job seniority." Each driver has job seniority from the time he became a driver in the classification in question. Job seniority is the seniority which is used for bidding for the most sought-after trips. A driver with the highest job seniority is the last person to be laid off and is the one who gets his choice of

assignments within his classification. If a driver transfers from one classification to another he retains his company seniority but loses his job seniority. In other words, if a driver joins Western Gillette in 1965 as a city driver and transfers to a road position in 1970, the date of his company seniority is from 1965 but he must begin again from 1970 with respect to his job seniority as a road driver. Obviously this dual system of seniority acts as a deterrent to transfer from one classification to the other and plaintiffs allege that this has the effect of perpetuating past discrimination against minority employees becoming road drivers.

The two leading cases in this area of locked-in discrimination are Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971) and Jones v. Leeway Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970). In *Bing*, Roadway Express had a policy that if an employee transferred from city to road he must resign his position and thereby forfeit all employment rights. He must then apply for the new position as if he were a stranger, with no assurance prior to resigning his job that he would be hired for the new position. In *Jones*, there was also a no-transfer policy between city and road positions.

█ In those cases, the respective courts held the effect of the facially-neutral policy against transfer was to lock in past discrimination and the result was that minority drivers were denied access to road positions. In *Bing* the Fifth Circuit points out the fact that just because the seniority system and transfer limitations apply equally to White and minority drivers is no justification if the result is that it locks in past discrimination:

"In defense of the policy Roadway argues that the rule has been applied equally to both black and white employees and has prohibited transfers from the road driver unit to the city driver unit as well as from the city unit to the road unit. True though

this may be, it is not a satisfactory answer to Bing's contention that in actual effect the facially neutral policy is discriminatory. Those white drivers who were employed as city drivers presumably had the opportunity to apply as road drivers but either were not qualified or preferred city work. Unlike Bing, the white drivers were not barred from the position of road driver by virtue of their race. Consequently, though the no-transfer policy may serve to keep all drivers in their present positions, the discriminatory hiring practices in effect at the time Bing was employed colors the policy, when applied to Bing and members of his class, with a distinctively discriminatory tint." Bing v. Roadway Express, Inc., 444 F.2d 687 at 690.

Defendants argue that the instant case is different from *Bing* and *Jones* in that in *Bing* and *Jones* there was either a no-transfer policy or what in effect is the same thing in that if an employee transferred from city to road he had to start over as a new employee. In our case, so defendants' argument goes, the employee only loses his job seniority and he keeps his company seniority and is not treated as a stranger to the company. This is clearly a distinction between the instant case and *Bing* and *Jones* and, apparently, this problem of how far the concept of locked-in discrimination reaches is one of first impression before the federal courts. Further, in *Bing* and *Jones* there were no minority drivers who were road drivers unlike the present case where there are some. But even though the facts are different, this court holds the result is the same: discrimination. This court repeats what it said earlier, just because the discrimination is more subtle than in *Bing* and *Jones* does not make it any less invidious. The dual seniority system here as in *Bing* and *Jones* locks in past discrimination because it discourages to a large extent minority employees from transferring from city to road.

█ Defendants further argue that there can be no discrimination in road

employment if there are no openings in road employment. Defendants have presented evidence that Western Gillette's business at the Houston terminal has declined and there have been in the last few years always some road drivers laid off. Thus, defendant argues that the reason minority members have not been able to transfer to road positions is because there were no positions available. But the fact is that there were new road drivers during the period in question and that "casuals" have forced on to become road drivers. A casual is someone who is hired by the Company to work temporarily during periods of high volume. Under the bargaining agreements between Company and unions and the interpretations of these bargaining agreements a casual road driver (other than a regular driver on layoff working as a casual) can force an employer to take him on as a regular employee if he has work and has made himself available for work for a continuous period of thirty-one days. During the period from 1968 to 1971, there were seven men who forced on at Houston as line drivers. Defendant Western Gillette argues that this does not indicate there were positions available for these drivers during this period but only that the terminal manager was lax in his work assignments and inadvertently let casuals work enough hours to force on when there were not positions for them. The Company's lack of intent may be correct. However, seven men were hired from 1968 to 1971 as road employees none of whom were minority drivers. This court, therefore, holds that there were positions available during this period. Even if there were no positions available, this court would still not countenance discrimination. Neither Company nor unions can have a dual seniority system that locks in past discriminations even if there happens to be no positions available at the time. This is because this court holds that should a position become available minority employees would be automatically discriminated against in obtaining this position because of the discriminatory dual seniority system.

Western Gillette as proof of its sincerity as being against discrimination points to a campaign in 1968 to hire minority drivers as road drivers throughout its operations in the United States. In an effort to recruit road drivers at Chicago and at Miami, Oklahoma, advertisements were placed in Chicago and direct contact was made with minority groups both there, here, and in Los Angeles. However, as far as this court can determine the Company did not do anything more in Houston other than offer these road openings to the one Black union steward. Laudable efforts and sincere statements by Company officials do not alter the fact that there was past discrimination and that the dual seniority system although facially neutral has the effect of locking in this past discrimination. Present good faith on the part of the Company and the unions has little relevance to the difficult question of facially neutral but in fact discriminating seniority systems.

Having determined that the employer has discriminated in the past and that the present policy of the dual seniority system perpetuates the past discrimination, the next issue is whether the present policy is justified by showing a business necessity. "When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, nonracial business purpose." Local 189, United Papermak & Paperwork v. United States, 416 F.2d 980 at 989 (5th Cir. 1969). If there is an overriding legitimate nonracial business purpose, this is a defense under a § 2000e suit. However, the evidence in this case does not indicate any such legitimate, nonracial business purpose that would justify what this court has found to be racial discrimination in the hiring and transfer practices of Western Gillette as they relate to city and road drivers. It is clear to the

court that the discrimination as found by the court is and was practiced both by the Company and by the unions within the aegis of § 1981.

The limits of § 1981 suits against labor unions have not been fully defined by the courts yet. However, at least one court has held that acquiescence in "locked-in" discrimination by a local union is a violation of the § 1981 prohibition against discrimination in the right to contract. Johnson v. Goodyear Tire and Rubber Co., 349 F.Supp. 3 (S. D.Tex.1972). This surely should so —the local union which signed the agreements providing for separate seniority rosters and which is the agent of its employees has a duty to protect its members against discrimination. This court also holds the Southern Conference and the International violated § 1981. Officials of these two organizations were intricately involved in the contract negotiations that led to the agreements in question. See Eagers v. Yellow Freight System, Inc., 4 F.E.P. Cases 1297 (N.D.Ga. No. 14510, July 21, 1972). The negotiations for the agreements are conducted on a nationwide and regionwide basis between committees made up of Southern Conference and International officials, and the local actually has little to do with the formulation of the agreements other than the formality of signing it. The International and Southern Conference argues, however, that the agreements providing for dual seniority are not on their face discriminatory and they had no notice that there was discrimination at the Houston terminal. This is not enough of an answer. These union organizations have a duty under § 1981 to inquire into the effect of the contract provisions when it is reasonable to assume, as it is here, that they might lead to discrimination. Unions under § 1981 have an affirmative obligation to protect members from illegal discrimination. This duty includes the responsibility to determine if the agreements they help negotiate lock in any such past discrimination.

## REMEDY

Having determined that Black and Mexican American employees of Western Gillette at its Houston terminal were discriminated against, both under the Civil Rights Act of 1964 and the Civil Rights Act of 1866, this court must now determine the remedy to be given these aggrieved plaintiffs. The question of remedy is a complex one because of the conflicting interests of plaintiffs and the various defendants as well as the many employees that will be affected by this court's order. This court must first deal with the question of the dual seniority system. This dual seniority system has locked in past discrimination against minority groups at the Houston terminal. But this court feels that it would be too drastic a remedy to completely merge the two seniority systems. Such a remedy would have various major shortcomings. It would prejudice recently hired or transferred road drivers including minority drivers because they could be bumped off their job by city drivers with lower seniority on the city roster. Further, city employees who during the early years of their employment have enjoyed a weekly guarantee and consequent higher pay as compared to similarly situated road drivers would be permitted to move to the road with a resulting freeze of lower seniority men in the least attractive low-paying road jobs. Top seniority city drivers who could not meet traffic skills and the driving skills required of them would be able to bump into the most attractive road positions. This court is persuaded that doing away with the dual seniority system entirely and having only one seniority roster would, therefore, create chaos and be detrimental to both minority and non-minority employees as well as the Company. In questions of this kind, the court must tread softly and must fashion a remedy which has the least destructive effects on both Company's and employees' desires while at the same time obviating the effects of past discrimination.

As suggested by plaintiff in his Post Trial Memorandum, the following changes will be ordered to be placed into effect:

1. As to the class previously defined who evidence a desire to accept road employment at any Western Gillette terminal in the Southern Conference, the Company is ordered to avail such persons the opportunity to transfer, with seniority dating to the date they would otherwise have sought road employment but for the discriminatory practices, but in no event will such seniority date be earlier than July 2, 1965. As to such transfers, the union defendants are enjoined to not oppose their effectuation.

2. Any individual who transfers pursuant to 1, above, and whose date of employment as a city driver is earlier than his new seniority date on the road, shall have his accumulated city seniority frozen, and at any time after six months as a road driver, shall be able to return to a city position with such accumulated city seniority.

3. As to future operations of the Company, after the effective date of this relief, all employees of the Company shall be entitled to move freely from city to road and from road to city. Upon such transfer, the transferee shall go to the bottom of the roster of the classification to which he is transferring, but he shall retain his accumulated seniority in the classification from which he has transferred. If, after six (6) months, the person desires to return to his former classification, he may do so on the basis of his frozen accumulated seniority rights in such former classification.

4. Those persons who have previously transferred from city to road or from road to city, and who, in so doing, lost their accumulated seniority in their former classifications, shall have such lost accumulated seniority restored for the purpose of exercising their seniority rights should they, in the future, desire to return to their former classification.

5. Any person who requests to be transferred either from city to road or from road to city must meet all reasonable qualifications relating to his ability to perform the job to which he requests a transfer.

6. As to all of the above, the Company is ordered to implement the necessary changes, and the union is enjoined from opposing such implementation.

This court feels that the above remedy would be the most appropriate means to destroy the effects of past discrimination on members of the class. The reason class members who were discriminated against may transfer to any terminal in the southwest area and not just the Houston terminal is that the evidence shows that Houston city drivers were discriminated against in transferring to road positions at the Houston terminal. The full dual seniority system remains in effect for nonminority city drivers since this is what the employer and employees desire as evidenced by their actual practice and their collective bargaining agreements.

This court orders the Company and the unions to implement the above remedy and enjoins both the Company and the unions from interfering with these changes or with the rights of members of the class to act pursuant to this relief. The plaintiffs also seek monetary damages, basically in the form of back pay. This is a rule 23(b)(2) class action which is used when the representatives of the class are seeking final injunctive relief or corresponding declaratory relief. It is used when the relief sought is primarily injunctive or declaratory relief. However, it is also permissible in a rule 23(b)(2) class action to seek and obtain back pay as part of the injunctive relief needed to obviate past discrimination. See Johnson v. Georgia Highway Express, Inc., 417 F. 2d 1122 (5th Cir. 1969); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Wright & Miller, Federal Practice and Procedure § 1775. This court holds that members of a class who would have transferred to road positions or who would have hired on as road positions absent discrimination are entitled

to back pay equaling the difference between the salary they did receive and the salary they would have received absent discrimination. The second half of this bifurcated trial will be held on the question of implementing the court's remedy and on the question of back pay damages and attorneys' fees and evidence will be presented on these issues at that time. This court holds that any difference in pay will be paid to the members of the class by the defendant Company. The Company maintains that it is not liable for the dual seniority system. However, the Company in its collective bargaining agreements with the unions agreed to accept the principle of seniority under the different contracts as a basis for assignments of work for its employees. At the very least the Company knew of the dual seniority system and accepted it. Further and more importantly, the testimony of witnesses and the statistical evidence show that the Company discriminated against members of the class who desired to become road drivers. The Company may not evade its burden of having to pay to rectify this discrimination by saying the seniority system is the unions' responsibility alone.

 The question of attorneys' fees involves an allocation of responsibility for this discrimination among the various defendants. The 1964 Civil Rights Act provides that the court, in its discretion, may allow the prevailing party reasonable attorneys' fees as part of the costs. 42 U.S.C.A. § 2000a–3(b). The Fifth Circuit has held that in a § 1981 action the court may also award attorneys' fees. Jinks v. Mays, 464 F.2d 1223 (5th Cir. 1972). All defendants argue that they have no responsibility for the discrimination. As noted earlier this court holds that the primary responsibility for the discrimination against the class is the Company's since the Company is the one that practiced overt discrimination in transferring which resulted in locked-in discrimination of the dual seniority system. Both the International and the Southern Conference, on the one hand, and the Local, on the other hand, argue that because of the collective bargaining structure they have nothing to do with any discrimination. The unions' attempts to wash their hands of the discrimination must fail. As far as the Local is concerned, it acquiesced in the discrimination practiced against its members. Further, the Local gave a written power of attorney to a bargaining committee representing the Southern Conference of Teamsters (the National Teamster Union is divided into various regional conferences, one of which is the Southern Conference) which negotiated the contract. The bargaining agreement authorizing this seniority system was signed by the Local and also negotiated by an agent of the union and, therefore, the Local is responsible for it. International and Southern Conference argue that any discrimination is a matter between the Company and the Local. These unions argue that neither International nor Southern Conference was a bargaining agent of the Local. To understand this contention reference must be made to the manner in which collective bargaining arguments are reached. The basic nationwide contract between the Teamsters Union and employers throughout the country is the National Master Freight Agreement. This is negotiated by committees representing local unions and various employers. Incorporated into the National Master Freight Agreements are various supplemental agreements entered into between negotiating committees for the Teamsters locals in the conference in question and committees for the employers in the conference. These supplemental agreements affecting the class in this suit are the Over-the-road Supplemental Agreement and the Local Freight Forwarding Supplemental Agreement for the Southern Conference and they are signed by the local union. Even though in theory perhaps neither the Southern Conference nor International are part of the agreements, in practice the negotiating committee is made up of International and

Southern Conference officials at least in part responsible for its outcome. As this court said earlier, all union organizations violated their duty under § 1981 to protect the class from discrimination. Therefore, this court allocates attorneys' fees as follows: one-half to be paid by the Company, the other one-half to be paid equally by the three union organizations.

Plaintiffs have also sued defendant unions alleging a breach of duty of fair representation under 29 U.S.C. § 151. The landmark case on the duty of fair representation is Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). This case held that a bargaining representative of employees has a duty "to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." Steele v. Louisville & Nashville R.R. Co., *supra* at 202, 203, 65 S.Ct. at 232, 89 L. Ed. at 183. This court holds that there has been no breach of duty of fair representation by any of the union defendants. The unions have acquiesced in a seniority system that perpetuates past discrimination but that does not give rise to a breach of their duty of fair representation. To breach this duty there must be evidence that the unions acted unfairly or unimpartially or not in good faith or with hostile discrimination. Richardson v. Texas & New Orleans R.R. Co., 242 F.2d 230 (5th Cir. 1957).

To sum up, the class plaintiff Sabala may represent is all Mexican Americans and Blacks currently employed by Western Gillette during the pendency of this action as city drivers in Houston, Texas. Plaintiff Sabala and the class he represents and plaintiff Ramirez have proven discrimination against the defendant Employer under § 1981 and § 2000e and against the defendants Local, Southern Conference, and International under § 1981. Both Company and unions are to some extent responsible for this discrimination although the Company has the greater burden of responsibility. Plain-

tiffs have not shown a breach of the duty of fair representation by any of the defendant unions. This court enjoins all defendants from continuing the discriminatory practices discussed herein and orders the parties to change the seniority system in accord with this opinion. This court recognizes that the parties are far better equipped than this court to formulate a judgment in accord with this opinion that disrupts to as small an extent as possible the practices and agreements of the unions and the Company.

The clerk will notify counsel when the hearing on remedy and damages will be set and at that time counsel are to present evidence as to how best to implement this court's order. Counsel will submit an order, or orders if counsel cannot agree, in accordance with this opinion at that time.