Richard B. SAGERS, Plaintiff-Appellee,

v.

YELLOW FREIGHT SYSTEM, INC.,
Defendant-Appellee,

v.

TRUCK DRIVERS AND HELPERS,
LOCAL UNION NO. 728 et al.,
Defendants-Appellants.

No. 74–3617.

United States Court of Appeals,
Fifth Circuit.

April 2, 1976.

L. N. D. Wells, Jr., Dallas, Tex., for defendants-appellants.

Robert L. Mitchell, Atlanta, Ga., for Local 728, Intern'l & Sout. Con.

Jack Greenberg, Morris J. Baller, Barry L. Goldstein, New York City, O. Peter Sherwood, Brooklyn, N. Y., John R. Myer, Atlanta, Ga., for Sagers.

Charles Kelso, Atlanta, Ga., for Yellow Frt.

Gerald D. Letwin, EEOC, Washington, D. C., amicus curiae.

Henry M. Rosenblum, Robert B. O'Keefe, Houston, Tex., for Stowers, and others, plaintiffs.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

This case is one more in a spate of lawsuits [1] brought by minority truck

---

1. The two most recent cases from this circuit are *United States v. T.I.M.E.–D.C.,* 5 Cir. 1975, 517 F.2d 299, U.S.App.Pndg., and *Sabala v. Western Gillette, Inc.,* 5 Cir. 1975, 516 F.2d 1251, U.S.App.Pndg. Less than a year earlier, this Court decided the trilogy of *Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40, U.S.App.Pndg.; *Herrera v. Yellow*

drivers against their employers and union representatives, charging racial discrimination in hiring practices and transfer policies, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e,[2] et seq. and 42 U.S.C. § 1981.[3] The instant case, brought against Yellow Freight as a class action by black employees represented by the Teamsters Union, presents many facts virtually identical to those adjudicated by this Court in previous decisions. What distinguishes this case is that it comes before the Court on appeal from a grant of summary judgment for the plaintiffs. We recognize, as the district court did, that summary judgment is rarely given in complex cases charging racial discrimination in employment. Nonetheless, we agree with the district judge that the unrefuted evidence presented by the plaintiffs, as well as recent cases resolv-

ing many of the legal issues, made the instant case appropriate for summary disposition. We further hold that the district court's refusal to dismiss the International union and its decision to assess plaintiffs' attorneys' fees against the two defendants were entirely proper. We affirm the judgment below.

At the outset it should be noted that of the original defendants, only the unions appealed the judgment below. The defendant-employer, Yellow Freight, here sides with the plaintiffs in urging this Court to affirm the district court's grant of summary judgment. Although denying that the company ever intentionally engaged in discriminatory employment practices, Yellow Freight apparently recognizes that its hiring and transfer policies have already been held to violate Title VII and § 1981.[4] Accord-

---

*Freight System, Inc.,* 5 Cir. 1974, 505 F.2d 66; and *Resendis v. Lee Way Motor Freight, Inc.,* 5 Cir. 1974, 505 F.2d 69, U.S.App.Pndg., which, in turn, were preceded by *Franks v. Bowman Transp. Co.,* 5 Cir. 1974, 495 F.2d 398 rev'd in part, —— U.S. ——, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 U.S.L.W. 4356 (March 24, 1976); *Witherspoon v. Mercury Freight Lines,* 5 Cir. 1972, 457 F.2d 496; *Belt v. Johnson Motor Lines, Inc.,* 5 Cir. 1972, 458 F.2d 443; and *Bing v. Roadway Express, Inc.,* 5 Cir. 1971, 444 F.2d 687 (*Bing I*). Cases from other circuits include *Thornton v. East Texas Motor Freight,* 6 Cir. 1974, 497 F.2d 416; *United States v. Roadway Express, Inc.,* 6 Cir. 1972, 457 F.2d 854; *Jones v. Lee Way Motor Freight,* 10 Cir. 1970, 431 F.2d 245, *cert. denied,* 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; *United States v. Central Motor Lines,* W.D.N.C. 1971, 338 F.Supp. 532, 352 F.Supp. 1253; *United States v. Pilot Freight Carriers, Inc.,* M.D.N.C.1973, 54 F.R.D. 519, 4 FEP Cases 472; *United States v. Navajo Freight Lines, Inc.,* C.D.Cal.1973, 4 FEP Cases 1044, 6 FEP Cases 274.

2. 42 U.S.C. § 2000e–2 provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment op-

portunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . . . .

(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

3. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

4. In *Herrera v. Yellow Freight System, Inc.,* 5 Cir. 1974, 505 F.2d 66 (decided after the in-

ingly, to avoid prolonged litigation and to "get on with the job of operating its business without regard to race of its employees", Yellow Freight urges affirmance of the summary judgment in favor of the plaintiffs.[5] Only the unions and certain unnamed class members contest the judgment below.

## I

## SUMMARY JUDGMENT OF LIABILITY

### A. Defendants' Discriminatory Practices.

Plaintiff Sagers brought the complaint on behalf of the class of black employees of Yellow Freight working within the Southern Conference[6] of Teamsters. He alleged that the company had systematically discriminated against black employees by refusing to hire them in the well-paying position of road driver,[7] and by refusing to permit any employee, black or white, to transfer from the less lucrative position of city driver to road driver without first resigning from the city position. Although the "no-transfer" policy was applied to both black and white employees,[8] its discriminatory effect was felt only by blacks: a white employee, having acquired the experience and expertise necessary to qualify for an over-the-road

stant case), this Court expressly invalidated Yellow Freight's past hiring practices and present no-transfer policies as applied to Mexican-American employees. Moreover, counsel for Yellow Freight, who also represented the defendant-employer in *Bing v. Roadway Express, Inc.,* 5 Cir. 1971, 444 F.2d 687 (*Bing I*), 5 Cir. 1973, 485 F.2d 441 (*Bing II*), candidly admits that he exhausted his arguments in favor of the company's position in that case, and now concedes there are no further defenses to be raised.

5. Yellow Freight urges affirmance not only because the issues are well settled, but in order to cut off liability for back pay which Yellow Freight now concedes is due even unnamed class members. See discussion at III. B. 2 *infra.*

6. In its original order dated July 21, 1972, 58 F.R.D. 54, ruling that the action was maintainable as a Rule 23(b)(2) class action, the court defined the class to include "all black employees of Yellow Freight, excluding office and supervisory personnel, who are employed within the area covered by the Southern Conference of Teamsters, that is, the states of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Oklahoma, Tennessee, and Texas", noting, however, that "[t]he definition of the class set forth today may be, of course, modified as required pursuant to Rule 23(c)(1)." In its final order of September 9, 1974, 388 F.Supp. 528, *the court narrowed the class to "all presently employed black employees of Yellow within the Southern Conference area who were employed prior to July 1, 1971."* The court's failure to exclude office and supervisory personnel from the final definition of the class, was an obvious oversight which may be remedied on remand.

7. The terms "road driver" and "over-the-road driver" are used interchangeably. For a general discussion of the positions of city and road drivers in the trucking industry, *see Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40, 46, *United States v. T.I. M.E.–D.C.,* 5 Cir. 1975, 517 F.2d 299, 305, and *Bing v. Roadway Express, Inc.,* 5 Cir. 1971, 444 F.2d 687, 688. The hiring practices and transfer policies of Yellow Freight were virtually identical to those of other defendant-employers in previously cited cases, and need not be elaborated here. *See Herrera v. Yellow Freight System, Inc.,* 5 Cir. 1974, 505 F.2d 66. It is sufficient to note that the position of road driver, though concededly more strenuous than that of city driver, has distinct advantages over the latter position. For example, the pay differential between city and road work within Yellow Freight's operations is substantial, with road drivers typically earning considerably more than city drivers, as indicated in the following table:

Systemwide Average Income

| Year | Road Driver | City Driver | Annual Difference |
|---|---|---|---|
| 1969 | $14,596 | $ 9,678 | $4,918 |
| 1971 | 15,734 | 12,102 | 3,632 |

8. In his individual claim for relief, plaintiff Sagers alleged this no-transfer policy was applied discriminatorily. Although Sagers produced evidence to show that certain white employees had been granted "leaves of absence with retreat rights" permitting them to try out new positions without resigning from their old ones, the court was not convinced that the company's occasional decisions to relax the no-transfer rule were racially motivated. See discussion at VI *infra.* In any event, it was conceded that there was no evidence that any employee, black or white, had been permitted to carry over his previously accumulated seniority to a new position.

position,[9] could resign from his city position in the reasonable anticipation that he would be rehired as a road driver; the equally qualified black employee, desirous of employment in a road position, harbored no such illusions. Aware of the company's policy of refusing to hire blacks as road drivers, he dared not resign his secure position as a city driver. Thus, the plaintiffs alleged, black city drivers were effectively locked into their less well paying positions, assured by the company practices that any attempt to gain more lucrative employment as road drivers would be futile.

Additionally, the plaintiffs urged that the unions' maintenance of separate seniority lists for individual bargaining units and their policy of refusing to grant "carryover seniority"[10] for employees who moved from one company bargaining unit to another, perpetuated the discriminatory effect of Yellow Freight's hiring policies even after such policies has ceased.[11] Seniority under the collective bargaining agreement negotiated by the unions was calculated according to individual bargaining units: since city drivers and road drivers were in separate bargaining units, an employee who moved from city to road lost any seniority rights accumulated during his years as a city driver.[12] This policy too, though facially neutral, effectively discriminated against black employees by perpetuating the effects of the company's past discriminatory hiring practices. While white drivers could resign from city positions and begin to accumulate seniority rights as road drivers from the moment they qualified for that position, black employees, locked into their city positions by the company's refusal to hire them in road positions, had no such opportunity. Even when the company began to hire blacks in over-the-road positions, the unions' refusal to permit

9. Yellow Freight's affidavits stated that road driver applicants were required to have "among other things . . . two years prior road driving experience handling similar equipment under similar conditions to that involved in Yellow's operations." In its final decree, giving qualified black employees a one-time-only opportunity to transfer to over-the-road positions, the court provided that "[a]ll members of the class who had timely expressed a desire for an over-the-road driving job and *who can demonstrate one year tractor-trailer or two years straight truck driving experience or a combination thereof*, shall be entitled to demonstrate their driving skill to qualify for such job. They shall be allowed a reasonable time period if they desire to familiarize themselves with company equipment prior to demonstrating their driving skills."

10. This refusal to grant "carryover seniority" is synonymous with the unions' maintenance of separate seniority rosters for individual bargaining units. *See Rodriguez v. East Texas Motor Freight*, 5 Cir. 1974, 505 F.2d 40, 47. Seniority is crucial for job bidding and layoff purposes, and this Court has recognized that "[i]n any industry loss of seniority is a critical inhibition to transfer." *United States v. Jacksonville Terminal Co.*, 5 Cir. 1971, 451 F.2d 418, 453. Here, as in *Rodriguez*, the "inability of city drivers to carry over their competitive-status seniority formed an important link in the chain that 'locked' minority drivers into city driver job." *Rodriguez*, 505 F.2d at 61. For a fuller discussion of the "lock-in" effect of dual seniority systems

with no carryover of competitive status seniority, *see Rodriguez*, 505 F.2d at 47, 52–53; *Bing v. Roadway Express, Inc.*, 5 Cir. 1973, 485 F.2d 441, 445, 449–452; *Sabala v. Western Gillette, Inc.*, S.D.Tex.1973, 362 F.Supp. 1142, 1149–51.

11. To be precise, the district court expressly refused to determine the date on which Yellow Freight's discriminatory hiring practices ceased. It accepted, however, for purposes of determining class membership, the cut-off date of July 1, 1971 agreed upon by Yellow Freight and the plaintiffs. There was some evidence that the company's affirmative action hiring program to recruit blacks and other minorities was vigorously pursued after 1971, when the company threatened to remove local managers unless they met their minority hiring goals. The court noted, however, that the statistical evidence submitted by the plaintiffs fully supported the contention that racial discrimination in hiring had lasted *at least* until July 1, 1971, and that its decision to include in the class only black employees hired before that date could in no way adjudicate the rights of employees subsequently hired.

12. The seniority rights in question are those of "unit seniority" or "competitive status seniority", governing employees rights for purposes of bidding and layoffs. Company seniority, for purposes of fringe benefits, is not affected by the maintenance of separate seniority rosters. *See Rodriguez v. East Texas Motor Freight*, 5 Cir. 1974, 505 F.2d 40, 47; *Franks v. Bowman Transp. Co.*, —— U.S. ——, 96 S.Ct. 1251, 47

carryover of seniority from city to road operated as a barrier to blacks who had accumulated seniority in their city positions, to transfer to road positions where their previously earned seniority rights would be lost.

In sum, the plaintiffs alleged that Yellow Freight's initial refusal to hire blacks as road drivers established a pattern and practice of racial discrimination in violation of Title VII and § 1981, and that the company's continued "no-transfer" policy, when coupled with the unions' refusal to permit carryover of seniority from city to road positions, perpetuated the effects of such discriminatory practices even after the practices had ceased.

### B.
### Proceedings in the District Court.

The district court agreed with these contentions. In its order of September 28, 1973, granting partial summary judgment in favor of the plaintiffs, it found that: (1) Yellow Freight had in the past excluded blacks from the position of road driver on the basis of race, (2) the no-transfer policies of Yellow Freight and the unions' maintenance of separate seniority lists for city and road driver bargaining units violated Title VII and § 1981, and (3) the plaintiffs were entitled to relief from the defendants' unlawful practices, including modification of the no-transfer rule and applicable seniority provisions.

■ In its extensive and carefully documented order, the district court articulated its reasons for invoking the summary judgment provisions of rule 56.[13] The court was well aware that the movant carried the burden of showing that no genuine issue as to a material fact existed. *Shahid v. Gulf Power Co.*, 5 Cir. 1961, 291 F.2d 422, 423. Nonetheless, the district judge found that the unrefuted evidence adduced by the plaintiffs, when considered in light of the recent pronouncements of this Court in similar cases of alleged racial discrimination in employment, justified the grant of summary judgment.[14]

---

L.Ed.2d 444, 44 U.S.L.W. 4356, 4362–63 (March 24, 1976).

13. Rule 56(a), Fed.R.Civ.P. permits a claimant to move for summary judgment "upon all or any part" of his claim. Rule 56(c) deals with the proceedings on a motion for summary judgment and provides in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.* A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Rule 56(e) further provides in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may *not rest upon the mere allegations or denials of his pleading,* but his response, by affidavit or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.* If he does not so respond, summary judgment, if appropriate, shall be entered against him. (Emphasis added.)

In the instant case, the unions neither disputed the accuracy of the facts adduced by the plaintiffs, nor presented facts of their own to support their position. As the district court noted, " 'it is certainly well settled that the opposing party is not entitled to hold back his evidence until trial on the possibility that an issue of material fact might arise if the case were to go to trial on the merits' "quoting 6 Moore, *Federal Practice,* ¶ 56.22[2], at 2822 (1972), quoted in *Cunningham v. Securities Investment Co.*, 5 Cir. 1960, 278 F.2d 600, 603. Moreover, the mere fact that the unions vigorously disputed the legal conclusions to be drawn from the facts presented by the plaintiffs was no bar to the grant of summary judgment. *See Palmer v. Chamberlin*, 5 Cir. 1951, 191 F.2d 532, 540; *Aho v. Erie Mining Co.*, 8 Cir. 1972, 466 F.2d 539.

14. In its legal conclusion that the defendants' practices constituted unlawful discrimination in violation of Title VII and § 1981, the court relied in particular on *Witherspoon v. Mercury Freight Lines, Inc.*, 5 Cir. 1972, 457 F.2d 496; *Bing v. Roadway Express, Inc.*, 5 Cir. 1971, 444 F.2d 687, and *Jones v. Lee Way Motor Freight Co.*, 10 Cir. 1970, 431 F.2d 245, cert. denied, 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237. As noted below, however, later decisions of this Court further support the district court's conclusions of law. *See* cases cited at footnote 16 *infra.*

The district court's finding that the employer Yellow Freight had engaged in a pattern and practice of excluding blacks from the position of road driver was based almost exclusively on statistical evidence. These statistics, furnished by the company and undisputed by the unions, established that before July 1968, Yellow Freight had only one black road driver throughout its nationwide system (in which it employed more than 8400 persons) and none in the Southern Conference. They further established that plaintiff Sagers was the first black road driver hired in the Southern Conference in November 1969, and that no black road drivers were hired after Sagers until 1971. In addition to this statistical evidence, the plaintiffs produced testimonial and documentary evidence, including admissions by company officials, that until 1967 the company's primary source of recruits for road driver jobs was referrals from white employees already with the company,[15] and that local managers "simply were not hiring blacks for road driver jobs."

None of the evidence was disputed. Relying on recent cases from this circuit and others, the court noted that a prima facie case of racial discrimination may be established by statistical evidence alone, and that a violation of Title VII may be established by statistics as a

matter of law.[16] In the instant case, the statistics and practices were virtually identical to those presented in earlier cases decided by this Court and other courts. *Bing v. Roadway Express, Inc.*, 5 Cir. 1971, 444 F.2d 687; *Witherspoon v. Mercury Freight Lines, Inc.*, 5 Cir. 1972, 457 F.2d 496; *Jones v. Lee Way Motor Freight*, 10 Cir. 1970, 431 F.2d 245, cert. denied, 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237. On the basis of the unrefuted statistics, the admissions of company officials, and recent cases invalidating similar practices, the court found Yellow Freight's past hiring practices indicative of a pattern and practice of racial discrimination in violation of Title VII and § 1981. On the same type of unrefuted statistical, testimonial, and documentary evidence, the court found, as a matter of law, that the combined effect of the company's no-transfer policy and the unions' maintenance of separate seniority lists with no carryover of seniority from city to road bargaining units, constituted an unfair employment practice under § 703(a)(2) of the Act.[17]

We find no error in the trial court's conclusions. The court properly recognized the importance of statistical evidence in establishing a prima facie case of racial discrimination. Moreover, although the district judge issued his or-

---

15. This Court has repeatedly held that "word-of-mouth" recruitment is unlawful where it serves to perpetuate an all-white force. See *Long v. Sapp*, 5 Cir. 1974, 502 F.2d 34, 41; *United States v. Georgia Power Company*, 5 Cir. 1973, 474 F.2d 906, 925; *Franks v. Bowman Transp. Co.*, 5 Cir. 1974, 495 F.2d 398, 418–19.

16. In *United States v. Hayes International Corp.*, 5 Cir. 1972, 456 F.2d 112, 120, we noted that "[t]he inference [of discrimination] arises from the statistics themselves and no other evidence is required to support the inference". We recently reaffirmed that proposition in *Sabala v. Western Gillette, Inc.*, 5 Cir. 1975, 516 F.2d 1251, 1261, stating "[a] pattern of past discrimin[ation] . . . may be established by statistical evidence in conjunction with other evidence or by statistical evidence alone." See also *Rodriguez v. East Texas Motor Freight*, 5 Cir. 1974, 505 F.2d 40, 53; *Herrera v. Yellow Freight System, Inc.*, 5 Cir. 1974, 505

F.2d 66; *Resendis v. Lee Way Motor Freight, Inc.*, 5 Cir. 1974, 505 F.2d 69; *United States v. T.I.M.E.–D.C.*, 5 Cir. 1975, 517 F.2d 299, 313; *Rowe v. General Motors Corp.*, 5 Cir. 1972, 457 F.2d 348, 358; *Bing v. Roadway Express, Inc.*, 5 Cir. 1971, 444 F.2d 687, 688; *Jones v. Lee Way Motor Freight, Inc.*, 10 Cir. 1970, 431 F.2d 245, 247, cert. denied, 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; *Witherspoon v. Mercury Freight Lines, Inc.*, 5 Cir. 1972, 457 F.2d 496, 498; *Carey v. Greyhound Bus Co., Inc.*, 5 Cir. 1974, 500 F.2d 1372, 1375; *United States v. Jacksonville Terminal Co.*, 5 Cir. 1971, 451 F.2d 418, 442, cert. denied, 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815; *Parham v. Southwestern Bell Telephone Co.*, 8 Cir. 1970, 433 F.2d 421, 426; *Pettway v. American Cast Iron Pipe Co.*, 5 Cir. 1974, 494 F.2d 211, 225 n. 34.

17. 42 U.S.C. § 2000e–2(a)(2). See footnote 2 supra.

der without the benefit of this Court's later decisions in *Rodriguez, Herrera, Resendis, T.I.M.E.,* and *Sabala,* those cases lend further support to the court's reliance on statistical evidence. "Once the plaintiffs established a prima facie case, the burden fell to the defendants to rebut the statistics or to explain the disparity in hiring." *Rodriguez,* 505 F.2d at 54. In the instant case, the defendants did neither. Their further failure to justify the practices as a business necessity warranted summary disposition of the case.[18]

 A plethora of unrefuted evidence justified an inference of racial discrimination by defendants Yellow Freight and the unions, for the former's initial hiring and transfer practices and for the latter's maintenance of separate seniority rosters. In the absence of any business necessity justifying such practices, and in recognition of this Court's previous (and subsequent) rulings on the invalidity of such practices, we hold that the district court's grant of summary judgment, entitling the plaintiffs to relief from the discriminatory practices, including modification of the no-transfer rule and applicable seniority provisions, was entirely proper.

18. Although this Court recognizes that a facially neutral policy which perpetuates the effects of past discrimination may be permissible if justified as a "business necessity", the test is a strict one:

"the 'business necessity' doctrine must mean more than that transfer and seniority policies serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. . . . Necessity connotes an irresistible demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. . . . If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued."

*Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40, 56, quoting *United States v. Bethlehem Steel Corp.,* 2 Cir. 1971, 446 F.2d 652, 662. As this Court stated in *United*

## II

## GENERAL SPECIFICATIONS OF RELIEF

In its original order of September 28, 1973, granting partial summary judgment for the plaintiffs, the district court found that a precise specification of the terms of remedial measures was not then appropriate for summary disposition. Noting that the length of discrimination in hiring had not yet been determined, the court delayed specification of the appropriate relief pending possible agreement by the parties or further simplified proceedings. On April 24, 1974, the plaintiffs and defendant Yellow Freight submitted a proposed consent decree outlining general specifications for relief to plaintiff Sagers and the unnamed members of the class. The unions' objections to the proposed decree were discussed and rejected by the court in its final decree of September 10, 1974, adopting in large part the provisions of the proposed decree of April 24.

The major provisions for remedial relief contained in the court's final order gave qualified black city employees a one-time-only opportunity to transfer to

*States v. Jacksonville Terminal Co.,* 5 Cir. 1971, 451 F.2d 418, 451, the defendant "[is] required to prove not only that the seniority systems and restrictions promote safe and efficient operation but also that they are essential to these goals." Repeated attempts to justify the no-transfer rule and the maintenance of separate seniority rosters have consistently failed, and the court below properly rejected the arguments advanced by the unions. *See, e.g., Local 189, United Papermakers & Paperworkers v. United States,* 5 Cir. 1969, 416 F.2d 980, *cert. denied,* 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; *Bing v. Roadway Express, Inc.,* 5 Cir. 1971, 444 F.2d 687; *Franks v. Bowman Transp. Co.,* 5 Cir. 1974, 495 F.2d 398; *Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40; *Herrera v. Yellow Freight System, Inc.,* 5 Cir. 1974, 505 F.2d 66; *Resendis v. Lee Way Motor Freight,* 5 Cir. 1974, 505 F.2d 69; *Sabala v. Western Gillette, Inc.,* 5 Cir. 1975, 516 F.2d 1251; *Jones v. Lee Way Motor Freight,* 10 Cir. 1970, 431 F.2d 245, *cert. denied,* 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237.

over-the-road positions.[19] Those who wished to take advantage of the 30-day offer were to be given "terminal date seniority" in their new positions, to be calculated according to the "qualification-date" formula announced by this Court in *Bing v. Roadway Express, Inc., (Bing II),* 5 Cir. 1973, 485 F.2d 441, 449–452.[20]

### A.
### Proof of Past Desire to Transfer.

■ The unions objected to this proposal on two grounds. First, they urged that the transfer and seniority relief could not properly be awarded every member of the class, absent a factual showing that each member had in fact applied for a transfer and that any such application, had it been made, would have been futile. Relying on this Court's decision in *Bing II,* the district court properly rejected the union's argument. In *Bing II,* we noted that the "realities of entrenched employment discrimination" which discourage black employees from attempting to transfer, make it an "unsound policy to date transferees' job seniority from their first application for transfer." 485 F.2d at 451. Similarly, in *Sabala v. Western Gillette, Inc.,* 5 Cir. 1975, 516 F.2d 1251, we recognized that "it makes little sense to require of minority employees, retrospectively, formal application for transfer to positions that they reasonably knew to have been closed to their class." 516 F.2d at 1256. In *Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40, we concluded that "the best indication whether a person desired transfer to road in the past is reflected in whether he desires transfer now." 505 F.2d at 64. These cases and others make clear that this Court, both before and after the district court's decree, has explicitly reject-ed the approach to Title VII litigation urged by the unions. Accordingly, we find no error in the district court's rejection of the unions' first objection to the proposed consent decree.

### B.
### Rightful Place Seniority—The Modified-Qualification Date Formula.

■ The second objection raised by the unions to the proposed consent decree was the provision for "carryover terminal seniority" without regard to whether vacancies in road driver positions existed at the time the class members became qualified to perform such jobs. This contention merits scrutiny. The qualification-date formula for calculating "rightful place" seniority was first articulated by this Court in *Bing II. Bing v. Roadway Express, Inc.,* 5 Cir. 1973, 485 F.2d 441, 445, 449–52. There we stated that under the theory of "rightful place" seniority adopted by this circuit in *Local 189, United Papermakers and Paperworkers v. United States,* 5 Cir. 1969, 416 F.2d 980,

> blacks are assured 'the first opportunity to move into the next vacancies in positions which they would have occupied *but for* wrongful discrimination and which they are qualified to fill.' *United States v. Georgia Power Co.,* 5 Cir. 1973, 474 F.2d 906. . . . Thus the rightful place theory dictates that we give the transferring discriminatee sufficient seniority carryover to permit the advancement he would have enjoyed, and to give him the protection against layoffs he would have had, in the absence of discrimination. How much seniority the transferee deserves should be determined *by the date he would have transferred but for his employer's discrimination.* [Emphasis added.]

---

19. This remedy has been approved by this circuit and others. *See, e.g., Rodriguez v. East Texas Motor Freight,* 5 Cir. 1974, 505 F.2d 40; *Bing v. Roadway Express, Inc.,* 5 Cir. 1973, 485 F.2d 441; *Sabala v. Western Gillette, Inc.,* S.D.Tex.1973, 362 F.Supp. 1142, *aff'd,* 5 Cir. 1975, 516 F.2d 1251; *United States v. T.I.M.*

*E.–D.C.,* 5 Cir. 1975, 517 F.2d 299; *Thornton v. East Texas Motor Freight,* 6 Cir. 1974, 497 F.2d 416; *United States v. Central Motor Lines, Inc.,* W.D.N.C.1971, 338 F.Supp. 532.

20. See discussion at IIB *infra.*

*Bing II*, 485 F.2d at 450; see *Franks v. Bowman Transp. Co.*, —— U.S. ——, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 U.S.L.W. 4356, 4360–62 (March 24, 1976). We noted that this "qualification-date" seniority was merely a variation on the theme of "company seniority carryover", an approach previously approved by this circuit.[21] *See Local 189, United Papermakers and Paperworkers v. United States*, 5 Cir. 1969, 416 F.2d 980, *cert. denied* 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; *United States v. Jacksonville Terminal Co.*, 5 Cir. 1971, 451 F.2d 418, *cert. denied* 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815.

Using this "but for" test as a guideline, the court developed the "qualification-date" formula for calculating an employee's carryover unit seniority. Under this formula, a black employee who elected to transfer from city to road was granted seniority from the date he first acquired the years of driving experience necessary to apply for an over-the-road position. Thus, if an employee had no prior driving experience before being hired by the company, his seniority would accrue from the date on which he first acquired sufficient experience to apply for a road job (usually two to three years). If, on the other hand, a city driver had sufficient prior driving experience to qualify for an over-the-road position at the time he was hired, his unit seniority in the new road position would be coterminous with his company seniority.

In *Bing II*, even this refinement of the broader "company seniority carryover" was subject to modification. There, two of the plaintiffs who had previous driving experience sufficient to qualify them for over-the-road positions at the time of hire, were employed during a period when the company was hiring no road drivers, black or white. Thus, the court found that even in the absence of racial

discrimination, and despite their qualifications for over-the-road jobs, the two plaintiffs would not have been hired into road positions at the time they joined the company. Since neither white nor black employees with similar qualifications were then being given the opportunity to accept positions as road drivers, the court refused to grant seniority rights as of that time. Rather, it awarded the plaintiffs seniority rights from "the earliest opportunity following their qualification dates at which any applicant could have been hired as a road driver". 485 F.2d at 452.

We followed this modified qualification-date formula in *Rodriguez v. East Texas Motor Freight*, 5 Cir. 1974, 505 F.2d 40. There too, we held that the calculation of seniority rights of transferees must take into account any hiatuses in the defendant-company's hiring of road drivers, stating that "[t]he seniority of any member of the plaintiff class whose qualification date falls within the period when ETMF did no hiring must date from March 1970, when ETMF resumed hiring." 505 F.2d at 63 n. 29. Most recently, we affirmed, in relevant part, the district court's decision in *Sabala v. Western Gillette, Inc.*, S.D. Tex.1974, 371 F.Supp. 385, *aff'd*, 5 Cir. 1975, 516 F.2d 1251, in which the lower court held that a transferee's "rightful place" seniority dates were to be "predicated upon the *job next available* anywhere in the Southern Conference after the date upon which such Southern Conference Discriminatee was qualified to drive over-the-road." [Emphasis added.] 371 F.Supp. at 388.

■ Finally this Court's most recent pronouncement on the subject of appropriate relief for victims of Title VII discrimination leaves little doubt as to the propriety of considering actual vacancies in an employer's workforce. In *United States v. United States Steel Corp.*, 5

---

21. "Company seniority" is simply a measure of how long an employee has been with the company, regardless of his position or the number of company jobs he has held. As noted above, it differs from "unit seniority", the

latter measuring an employee's position relative to his fellow workers within the bargaining unit, for purposes of job bidding and layoffs. See footnote 12 *supra*.

Cir. 1975, 520 F.2d 1043, we spoke to the issue of back pay due employees who had been discriminatorily denied the opportunity to work in more lucrative jobs; there we remanded the case to the district court with the following instructions:

> The district court . . . should . . . award back pay by reconstructing hypothetically each eligible claimant's work history. . . . To the extent that actual, historical vacancies in the employer's workforce can be flow-charted with reasonable accuracy, the court should award the back pay to the minority employee who, in its sound judgment, would have occupied those vacancies but for discrimination, and whose projections show a loss of wages. . . . *[T]he court should utilize those data for identifying "vacancies" in light of its decree, and should not presume that additional vacancies occurred.* [Emphasis added.]

520 F.2d at 1055.

In the instant case, paragraph 5 of the court's final decree provided for seniority as of the date of qualification for the road driver position:

> Members of the class who transfer to road-driving jobs when vacancies occur shall carry their terminal seniority for all bidding purposes, provided they met the experience qualifications set forth in paragraph 3, above, as of their terminal seniority date; otherwise, their bidding seniority shall date from the later time at which they first met the above qualification. . . .

In their original objections to the proposed decree, the unions argued that the court's provisions for "carryover terminal seniority", without regard to the existence of actual vacancies at the time class members became qualified to perform as over-the-road drivers, was contrary to this Court's *modified* qualification-date formula announced in *Bing II.* The court, though aware of the modified qualification-date formula and its application in *Bing II,*[22] rejected this argument on the ground that "[d]efendant Unions herein have made absolutely no effort in their objections to the proposed decree and to this motion for summary judgment to show the court that at certain periods vacancies in the over-the-road position were not available." Thus, the court rejected the unions' argument in favor of the modified qualification-date formulation not in theory, but for lack of proof.

 We think the district court's decision premature. Although the burden of showing a lack of vacancies is on the violators of the Act, *Baxter v. Savannah Sugar Refining Corp.,* 5 Cir. 1974, 495 F.2d 437, 444, *cert. denied* 1974, 419 U.S. 1033, —— S.Ct. ——, —— L.Ed.2d ——, that burden need not be met until the individual plaintiffs have come forward to assert their claims. *Franks v. Bowman Transp. Co.,* —— U.S. ——, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 U.S.L.W. 4356, 4363 and n. 32 (March 24, 1976). Title VII litigation is frequently conducted through a bifurcated proceeding. During the first state, general liability for discrimination against the class may be adjudicated; if such liability is

---

22. That the court was not unaware of the modified qualification-date formula was apparent in the latter portion of paragraph 5 of that order, where the court expressly acknowledged certain hiatuses in the hiring of road drivers at the Nashville and Dallas terminals, and qualified its seniority dates accordingly. Since this evidence was in the record then before the court, the district judge expressly determined that "the bidding seniority date of members of the class hired at the Nashville terminal after 1959 and prior to March, 1969 shall date from March, 1969 or the date at which they first met the qualifications set forth in paragraph 3, above, whichever is later;

and provided further the bidding seniority of the members of the class hired at the Dallas terminal after June, 1965 and prior to January, 1969 shall date from January, 1969 or the date they first met the qualifications set forth in paragraph 3, above, whichever is later."

23. This bifurcated trial procedure for Title VII litigation was summarized by Judge Gewin in *Baxter v. Savannah Sugar Refining Corp.,* 5 Cir. 1974, 495 F.2d 437:

> [a] Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the *class* to establish that an employer's employment practices

found, a second proceeding is held during which the specific relief due individual class members is determined and awarded.[23] In the instant case, Judge Freeman's grant of summary judgment represented a finding of liability following stage I; stage II has yet to be conducted. Until individual class plaintiffs are identified, however, and their straight qualification dates determined, the defendants cannot be expected to come forward with proof that no vacancies in road driver positions existed at the time such employees qualified for the jobs. The defendants here assert that there were extended periods at all terminals throughout the period involving this litigation during which no road drivers were hired; we think they should be afforded the opportunity to make such a showing.

We therefore modify the lower court's decree to provide for the calculation of terminal date seniority as of the date when an individual class plaintiff first qualified for road employment *and* such a position became available. We emphasize again that the burden of showing that no vacancies existed as of the employee's otherwise dispositive qualification date is on the defendants. Nonetheless, on remand, the company and the unions should be permitted to present evidence to show that in the case of any individual plaintiff, no vacancy in road driver positions existed at the time he first qualified for such employment. We otherwise affirm the district court's general specifications of relief, including the

one-time transfer opportunity for all qualified employees without regard to any prior requests to transfer.

## III

### PROPRIETY OF CLASS ACTION

In July 1972, the district court certified the case as appropriate for class action treatment. In its final decree of September 9, 1974, the court defined the class to include "all presently employed black employees of Yellow Freight within the Southern Conference area who were employed prior to July 1, 1971". The unions raise objections to both the definition of the class and the representation provided by plaintiff Sagers. None of the objections is sufficient to warrant reversal of the judgment below.

#### A.

##### Numerosity Requirement.

First, the unions allege that the numerosity requirement of Rule 23 (a)(1)[24] has not been met. This argument is frivolous. The affidavits and answers to plaintiffs' interrogatories submitted by Yellow Freight established that as of May 12, 1972, Yellow Freight employed approximately 130 blacks (excluding road drivers) at Southern Conference terminals. Since approximately 20 were hired after July 1, 1971, there appear to be approximately 110 members of the class, clearly a sufficient number to meet the numerosity requirements of Rule 23(a)(1). *See Rodriguez v. East Texas Motor Freight*, 5 Cir. 1974, 505 F.2d 40, 50; *Afro-American Patrolmen's*

have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the *class* of black employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the covered class, has suffered financial loss, and thus [is] entitled to back pay or other appropriate relief.

*Id.* at 443–44. *See also Sabala v. Western Gillette, Inc.*, 5 Cir. 1975, 516 F.2d 1251, 1255.

24. Fed.R.Civ.P. 23(a):

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*League v. Duck*, 6 Cir. 1974, 503 F.2d 294, 298; *Carey v. Greyhound Bus Co.*, 5 Cir. 1974, 500 F.2d 1372.

### B.
#### Adequacy of Representation.

Second, the unions contend that the class certification requirement of Rule 23(a)(4) was not met, in that the named plaintiff Sagers did not fairly and adequately protect the interests of the class.[25] To support this second challenge, the unions take issue with both the definition of the class and the relief afforded.

#### 1.
#### Cutoff Date for Class Membership.

Initially, the unions challenge the July 1, 1971 cutoff date as arbitrarily excluding from coverage those black employees hired after that time. As the court noted in the decree, there was ample unrefuted statistical evidence to support a finding that racial discrimination lasted at least until July 1971; the court specifically refused to determine whether discrimination in hiring continued after that date.[26] The court noted, however, that the definition of the class as including only blacks hired before July 1971 did not adjudicate any rights of blacks hired after that date. The July 1971 date was selected because the evidence conclusively established that before that time Yellow Freight's hiring practices had discriminated against blacks, and because both the company and the plaintiff could agree upon it as a cutoff date, thus facilitating disposition of the case.[27] The court's decision to accept the July 1971 date was not arbitrary, and we find no error in the selection of that date as the cutoff point for defining class membership.[28]

#### 2.
#### Relief Awarded Class Representative.

As an additional ground for challenging the adequacy of the representation provided for the class by plaintiff Sagers, the unions focus on the special relief awarded him. In its final decree, the district court found Sagers entitled to $6,000 as full compensation for lost wages suffered as a result of the company's discriminatory policies.[29] This provision, like the July 1971 cutoff date delineating the class, was adopted by the court following an agreement by Yellow Freight and the named plaintiff. According to the original settlement, plaintiff Sagers agreed not to press the back pay claims of unnamed class members, in exchange for Yellow Freight's promise to disclose nationwide its employment practices. At no time did the court purport to adjudicate the back pay claims of the unnamed plaintiffs. In fact, Yellow Freight concedes that the agreement included an understanding that unnamed

---

**25.** *Id.*

**26.** *See* note 11 *supra*. It is noteworthy that the unions do not now raise the issue of possible prejudice to employees hired after 1971 as a basis for extending the coverage of classwide relief, but only to invalidate the relief already granted.

**27.** In its original class certification order, the court specifically noted "the need to define the class in light of facts revealed through the continuing discovery." The limitation to employees hired before July 1, 1971, a refinement of the court's earlier definition of the class, is permitted under Rule 23(d). 3B J. Moore, *Federal Practice* ¶ 2377, at 23–1491 (2d ed. 1975).

**28.** A similar and equally meritless challenge to the definition of the class is the unions' contention that the plaintiff's representation was inadequate because Mexican-Americans were not included in the class. Although Mexican-Americans have often been the victims of racial discrimination, *see Herrera v. Yellow Freight System, Inc.*, 5 Cir. 1974, 505 F.2d 66; *Resendis v. Lee Way Motor Freight*, 5 Cir. 1974, 505 F.2d 69, there is no legal requirement that every class action include all victims of racial discrimination. The evidence presented by the plaintiffs did not deal with the exclusion of Mexican-Americans from the position of road driver, and there was no need to consider any possible discrimination against members of that group. The plaintiff's obligations under Rule 23(a)(4) were fulfilled if he adequately protected the interests of the class he purported to represent.

**29.** For the details of Sagers' individual case, see discussion at V, *infra*.

class members would retain the right to bring separate actions for back pay.

■ The unions allege that this back pay award to Sagers, coupled with the lack of any monetary award for the unnamed class members, conclusively establishes Sagers' failure to protect adequately the interests of the class. As noted above, the court's final decree, at the time it was entered, did not bar class members from asserting their back pay claims in later actions. More importantly, however, Yellow Freight's recent change of position regarding the availability of classwide back pay relief in *this action* moots the unions' objection entirely.

At the time of the agreement between Yellow Freight and the named plaintiff, the law in this circuit regarding the assertion of back pay claims by unnamed class members was unclear. Yellow Freight assumed that there was nothing inconsistent with the district court's award of monetary relief to plaintiff Sagers and the understanding that unnamed class members could later assert their back pay claims in individual actions. Since that time however, this Court held in *United States v. United States Steel Corp.*, 5 Cir. 1975, 520 F.2d 1043, 1053, et seq., that back pay claims of individuals represented in a class action, must be asserted in that action or be forever barred. Obviously, the result of this holding is to vitiate part of the understanding reached by Yellow Freight and the named plaintiff; unnamed class members, if not afforded monetary relief in later proceedings in this action, will be forever precluded from asserting such claims. Recognizing the effect of *United States Steel* on their prior agreement with the named plaintiff, Yellow Freight has changed its position. It now concedes that this case must be remanded for further proceedings in order to determine which individuals, if any, are entitled to back pay awards, based on losses suffered as a result of the company's discriminatory policies. This case is thus in a posture analogous to the *Bing* case when it first came before this Court. Stage I, adjudicating liability has been concluded, and there remains only stage II, during which the district court, on remand, must determine the specific relief to be awarded individual class members.

■ The recent holding of this Court in *United States Steel*, coupled with Yellow Freight's change of position on the issue of the back pay claims of unnamed class members, deprives the unions of any basis for their additional challenge to the adequacy of plaintiff Sagers' representation of the class. Since the award of back pay to plaintiff Sagers in no way affects the potential monetary recovery for unnamed class members on remand, no possible prejudice can result, and Sagers' representation is immune from challenge. Thus, this attack on the propriety of the district court's certification is baseless.[30]

The unions' various challenges to the propriety of the district court's certification of the case as appropriate for class treatment, including the delineation of the class and the relief awarded the named representative, are without merit. The numerosity requirement of Rule 23(a)(1) was met. The selection of July 1971 as the cutoff date for class membership was supported by unrefuted statistical evidence and was within the sound exercise of discretion given trial judges to determine the contours of a class action under Rule 23. Plaintiff Sagers adequately represented the interests of all class members as required by Rule 24(a)(4), and his own back pay recovery in no way prejudiced the future rights of the unnamed members of the class. For the foregoing reasons, we

---

30. Yellow Freight's change of position likewise removes any basis for voiding the court's previous order and for granting the motion to remand requested by the would-be intervenors, Stowers, et al. The primary objection of the unnamed class members to the court's approval of the proposed decree was its failure to award classwide back pay. Since it is now conceded that on remand the unnamed plaintiffs will have ample opportunity to assert these claims, no further consideration of the motion is required.

find no error in the district court's class action certification.

## IV

## FAILURE TO DISMISS THE INTERNATIONAL

The unions urge that the International should have been dismissed as a defendant. Relying on this Court's decisions in *Herrera* and *Resendis*, they argue that the International cannot be held liable for the maintenance of separate seniority lists since such lists originate at the Southern Conference level.[31] Reliance on the above cases is misplaced. In those cases the extent of the International's involvement in the negotiation of the National Master Freight Agreement and the regional supplemental agreements governing the seniority practices in question was neither briefed nor argued. Whatever the records there revealed, the record before us in the instant case clearly establishes that the connection between the International and the contracts in issue was sufficient to hold the International liable along with the regional and local unions.[32]

The collective bargaining agreements governing all Teamster locals in the Southern Conference consist of a National Master Freight Agreement [National Agreement], negotiated at three-year intervals, and supplemental regional agreements. The National Over-the-Road and City Cartage Policy and Negotiating Committee [National Negotiating Committee] is a party to both the National Agreement and the supplemental regional agreements. Though nominally independent of the International, the National Negotiating Committee is staffed by high-ranking officials of the International. In fact, National Negotiating Committee members include not only the General President of the International, but the General Secretary-Treasurer of the International, an International Vice-President and an International officer in charge of the Southern Conference, Dallas office.[33]

The obvious influence of the International on the National Negotiating Committee, and thus, indirectly, on the negotiation of the National and supplemental agreements, is clear from the record. Recent cases in this circuit and others

---

**31.** *Herrera v. Yellow Freight System, Inc.,* 5 Cir. 1974, 505 F.2d 66, 68 n. 2; *Resendis v. Lee Way Motor Freight, Inc.,* 5 Cir. 1974, 505 n. 2.

**32.** This case is not the first to hold the International liable for the unlawful seniority policies in effect at the regional and local levels. *See, e.g., Sabala v. Western Gillette, Inc.,* S.D. Tex.1973, 362 F.Supp. 1142, aff'd, 5 Cir. 1975, 516 F.2d 1251; *United States v. T.I.M.E.–D.C.,* 5 Cir. 1975, 517 F.2d 299; *U. S. v. Pilot Freight Carriers, Inc.,* M.D.N.C.1972, 4 FEP Cases 472. The rationale behind such a holding was explicated by the district judge in *Sabala:*

The negotiations for the [collective bargaining] agreements are conducted on a nationwide and regionwide basis between committees made up of Southern Conference and International officials, and the local actually has little to do with the formulation of the agreements other than formality of signing it. The International and Southern Conference argues, however, that the agreements providing for dual seniority are not on their face discriminatory and they had no notice that there was discrimination at the Houston terminal. This is not enough of an answer. These union organizations have a duty under

§ 1981 to inquire into the effect of the contract provisions when it is reasonable to assume, as it is here, that they might lead to discrimination. Unions under § 1981 have an affirmative obligation to protect members from illegal discrimination. This duty includes the responsibility to determine if the agreements they help negotiate lock in any such past discrimination.

362 F.Supp. at 1153.

**33.** Although nothing in the record identifies the affiliation of all members of the National Negotiating Committee, the record identifies the following Committee members as functionaries of the International:

| National Negotiating Committee Member | Title |
| --- | --- |
| Frank Fitzsimmons | International President |
| Weldon L. Mathis | International Vice-President |
| Murray W. Miller | International Secretary-Treasurer |
| Joseph W. Morgan | International General Organizer |

have, on the basis of similar records, held the International sufficiently responsible for the negotiation of the collective bargaining agreements to warrant a finding of liability. *Sabala v. Western Gillette, Inc.*, S.D.Tex.1973, 362 F.Supp. 1142, aff'd 5 Cir. 1975, 516 F.2d 1251; *United States v. T.I.M.E.–D.C.*, 5 Cir. 1975, 517 F.2d 299; *United States v. Pilot Freight Carriers, Inc.*, M.D.N.C.1972, 4 FEP Cases 472. We find no error in the district court's failure to dismiss the International.

## V

## SAGERS' INDIVIDUAL CLAIM

The relief awarded by the district court to plaintiff Sagers was based on the unique nature of his claim. Sagers had originally been employed in 1955 by Watson-Wilson Transportation, a predecessor corporation to Yellow Freight. Though initially hired as a dockman, he eventually became Watson-Wilson's first black city driver. When Yellow Freight acquired Watson-Wilson in 1965, Sagers continued to work as a city driver, taking with him the seniority accumulated from his date of hire with Watson-Wilson. In 1969, Sagers, having accumulated fourteen years seniority, desired to transfer to the position of road driver. He requested from Yellow Freight a leave of absence in order to try out the road driver job. Such a leave of absence, if granted, would have permitted Sagers to retain his fourteen years of city seniority, should he desire to return to his city job. Though Sagers alleged that other whites had been granted such leaves of absence with "retreat rights" ensuring against a loss of accumulated seniority upon returning to their original bargaining units, the company denied the leave of absence.

Sagers then resigned his job as a city driver at Yellow Freight's Nashville ter-minal (as required by the company's "no-transfer" rule) and was "rehired" as Yellow's first black over-the-road driver. After approximately ten days in his new position, Sagers was compelled to resign for reasons of health. He was reemployed as a dockman in the same bargaining unit of which he had been a member while working as a city driver; however, pursuant to the unions' seniority policies, Sagers received no credit for the fourteen years seniority he had accumulated in the city bargaining unit before his resignation.

Sagers' original request for summary judgment sought an adjudication not only on the issue of the defendants' liability to the class for their discriminatory hiring, transfer, and seniority policies, but also on his individual claim of discrimination based on Yellow Freight's refusal to grant his requests for a leave of absence. Although the latter motion was denied [34] in the district court's grant of partial summary judgment of October 23, 1973, the final decree did provide him with back pay relief of $6,000, restoration of his 1955 seniority date as a city employee in Atlanta if he decided to remain there, or "rightful place" seniority as a road driver should he elect to transfer to the road pursuant to the provisions of the class decree.

The unions challenge the final decree's award to Sagers as inconsistent with the court's prior refusal to grant summary judgment on his individual claim of discrimination. This argument fails to distinguish between the two claims originally advanced by the plaintiff. The award ultimately given Sagers, including the $6,000 (which Yellow Freight consented to pay and does not now challenge) was based on the relief granted *all* members of the class. It is precisely the type of relief which will be granted to all unnamed class members

---

**34.** Sagers presented evidence to show that six white employees had been granted leaves of absence with retreat rights. The court was not convinced, however, that Sagers had been "deprived of a fundamental benefit of employ-ment status which was routinely available to white employees", and therefore refused to hold, as a matter of law, that race was the basis for the denial of the plaintiff's request for a leave of absence.

who assert their back pay and rightful place seniority claims on remand. It thus did not conflict with the court's earlier determination that plaintiff Sagers had failed to satisfy "the heavy burden under Rule 56 to support summary judgment on the claim of individual racial discrimination." As the facts of Sagers' particular case were before the court, and Yellow had agreed to pay the $6,000 back pay award, the district court properly incorporated this provision into its final decree. No error arises from this action.

## VI

## ASSESSMENT OF ATTORNEYS' FEES

The unions contend that the district court improperly assessed against them one-half of the plaintiffs' attorneys' fees. They mistakenly assume that such an assessment is improper, absent an express determination that the unions have been "unreasonably and obdurately obstinate." No such finding is necessary.

■■■ In *Sabala v. Western Gillette, Inc.,* 5 Cir. 1975, 516 F.2d 1251, we recently held that under the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 1975, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed. 2d 141, attorneys' fees may be awarded "only if explicitly authorized by statute or by one of the traditional exceptions to the general rule." 516 F.2d at 1268. Congress has made such an explicit provision for Title VII litigation, by expressly authorizing a district court, in its discretion, to award reasonable attorneys' fees to the prevailing party.[35] This Court has repeatedly held that the provision is to be liberally interpreted to encourage private suits which effectuate the congressional policy against racial discrimination. *See, e.g., Baxter v. Savannah Sugar Refining Corp.,* 5 Cir.

1974, 495 F.2d 437; *Johnson v. Georgia Highway Express, Inc.,* 5 Cir. 1974, 488 F.2d 714, 717; *Long v. Georgia Kraft Co.,* 5 Cir. 1972, 455 F.2d 331, 337; *Clark v. American Marine Corp.,* E.D.La.1970, 320 F.Supp. 709, *aff'd,* 5 Cir. 1971, 437 F.2d 959. There is no question that the plaintiff prevailed in the court below, and the assessment of one-half his attorneys' fees was not an abuse of discretion.

## CONCLUSION

The proceedings below were conducted in accordance with the law established by recent decisions of this Court. There was no error in the district court's grant of summary judgment on the issue of liability and the general specifications of relief. As both the plaintiffs and company-defendant agree, the case is now appropriate for remand to the lower court to determine the individual back pay claims of unnamed class members. On remand, the district court should determine the seniority qualification dates of those class members who wish to assert their claims, according to the rightful place theory outlined by this Court and applied in *Bing, Rodriguez, Sabala,* and other recent cases. A class member's seniority is to date from the earliest opportunity following his qualification date when he could have been hired into a road driver vacancy. The defendants should be permitted to augment the record with statistics showing hiatuses in hiring at terminals other than Dallas and Nashville, and to show when vacancies occurred in over-the-road positions following the qualification dates of individual class members.

The lower court correctly certified the case as appropriate for class action treatment. The numerosity requirement of Rule 23(a)(1) was met, and the named plaintiff Sagers adequately protected the interests of the class. The district court did not err in finding the record suffi-

---

**35.** Section 706(k), 42 U.S.C. § 2000e–5(k), states:

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

740

cient to establish the liability of the International for the unlawful seniority policies of the local and regional unions. The record revealed sufficient undisputed facts in the case of plaintiff Sagers to permit the individual monetary award agreed upon by the defendant company. There was no error meriting reversal of the relief thus far granted.

The case is AFFIRMED with modifications and REMANDED to the district court for proceedings consistent with this opinion.